COMMODORE P. SUMMERS *et al.* *vs.* GEORGE SPYBUCK *et al.*

John Pipe, a Wyandotte Indian, received a patent for land allotted to him as head of a family, consisting of himself, Mary his wife and his minor children, Maria and Winfield. The patent was issued by the commissioners appointed under article three of Wyandotte treaty of January 31st, 1855, purporting to convey it all to him in fee simple absolute. *Held,* that the form of the patent precludes the idea of the land being conveyed by it to him in trust.

In the provision in article three of said Wyandotte treaty for the plat showing " the land assigned to each family and individual, the word" " individual,' *construed* to mean a person not a member of a family. The members of families, other than the heads, do not belong to either of the classes reported by the commissioner of Indian affairs, nor to those to which patents are to issue.

The treaty *construed* to mean that the lands were taken, assigned and patented to the heads of families *"for,"* or *on account of,* the other members of the family. The assignment and patent to John Pipe *held* to have vested in him a title in fee simple absolute, according to the intent and meaning of the treaty.

*Held,* that the trust deed from him and wife to plaintiff in error, gave them a valid lien on the land conveyed, and that the court erred in excluding it from a part thereof in an action for partition between said plaintiff and defendants in error.

The facts of the case were argreed on as follows: That John Pipe, at the date of the ratification of the Wyandotte treaty, January 31st, 1855, was a member of the Wyandotte nation of Indians; was the head of a family, consisting of himself, his wife, Mary Pipe, and two children by a former wife, named Maria Pipe and Winfield Pipe; that said Mary Pipe was the daughter of George Spybuck, and sister of James Spybuck, the plaintiff, and died childless, in the year 1857, at Wyandotte, in Kansas; that said John Pipe was placed on the competent list of Wyondotte Indians by the three commissioners appointed under an and by virtue of the said treaty; that the lands set out and described in

the said petition were allotted and assigned to him, the head of the family aforesaid, by said commissioners; that John Pipe died in the summer of 1859, leaving as heirs Maria Pipe and Winfield Pipe, still minors, and a widow, Jane Pipe; that on the first day of July, A. D. 1859, said John Pipe and Jane, his wife, gave a mortgage or trust deed of the whole of said lands to Commodore P. Summers and C. S. Wilson, to secure the payment of three hundred and nine dollars and seventy-five cents, which was duly recorded in Wyandotte county, Kansas, and that George Spybuck is the lawful guardian of James Spybuck; and that, on the first day of June, A. D. 1859, a patent was issued to said John Pipe, the head of said family, for said lands, the body of which reads as follows, to wit: "Whereas, pursuant to the provisions of the second, third and fourth articles of the treaty concluded on the 31st of January, A. D. 1855, between the commissioners on the part of the United States and the Wyandotte tribe of Indians, a return bearing date April 14th, 1859, from the commissioner of Indian affairs, has been made to the general land office, embracing a transcript entitled 'Wyandotte reserves, competent class, book A,' designating the several tracts or parcels of land awarded to the heads of families, and to individuals of said tribe, the said tracts or parcels of land being laid down on the plat connected with said book, bearing date the 22d of February, 1859, at Wyandotte City, Kansas, and certified by the United States commissioner and the commissioners for the Wyandottes, as the 'plat of the subdivisions of the lands belonging to the Wyandotte tribe of Indians,' situate in the forks of the Missouri and Kansas rivers, exhibiting the allotments assigned to each family and individual adjudged by said commissioners to be actual members of the Wyandotte nation at the date of the ratification of the treaty of January 31st, 1855, according to the laws, usages and customs thereof; and that the lines represented thereon have been surveyed and marked on

the ground, and the corners of the allotments established in the manner customary in the government surveys; and whereas, the following allotment of land, as described in said transcript book A, and laid down in the plat aforesaid, as number one hundred and thirty-two, has been made to John Pipe, the head of a family consisting of himself, Mary Pipe, Maria Pipe and Winfield Pipe, the said allotment of land being situated in what is known as the Wyandotte reserves in Kansas, said reserve being the tract of country situate in the forks of the Missouri and Kansas rivers, which was purchased by the Wyandotte nation from the Delaware Indians, and which allotment is bounded and described as follows, to wit: (Here follows a description of the land.) Now, know that the United States of America, in consideration of the premises, and pursuant to the provisions of the treaty aforesaid, have given and granted and by these presents do give and grant the tacts or parcels of land above described unto the said John Pipe as the head of the family as aforesaid, and to his heirs and assigns forever, as an absolute and unconditional grant in fee simple, to have and to hold the said tracts or parcels of land, with appurtenances, unto the said John Pipe as the head of the family as aforesaid, and to his heirs and assigns forever. In testimony whereof," &c.

The court below held that Maria and Winfield Pipe and Summers and Wilson were tenants in common in the land, and ordered a partition as follows: To defendants, George and James Spybuck, each, one-eighth part; to Maria and Winfield Pipe, each, one-fourth part, and to plaintiffs, Summers and Wilson, jointly, one-fourth part thereof. Exceptions to the decision were duly taken, and the cause brought to this court on a petition in error.

*D. B. Hadley*, for plaintiff in error.

The simple question involved in this case is, do the minors of the competent class of the Wyandotte Indians, and the wife

Summers and others *v.* Spybuck and others.

of the "head" of the family, own an interest in the lands patented to the head of the family by the United States, which they can have set apart to them by our courts, during the life of the head of the family?

These lands did not belong to the United States, but were owned in common by the entire Wyandotte tribe. They were not occupied by the minors, separate and apart from the family, but by the head of the family. Before the treaty (of January, 1855,) was adopted, all the heads of families of that class which were made full citizens by the treaty, occupied certain portions of the land as their own, just as a white man occupies his farm in rearing his family.

The treaty was entered into on the part of the Wyandottes by six of their chiefs and delegates, " they being thereto duly authorized by said tribe." (*See preamble to treaty.*) The cession to the United States, then, was by those six for the whole tribe. Of course they held a council when they concluded to authorize these six chiefs to cede those lands to the United States. No minors attend councils of Indian tribes. The men composing that council, then, were heads of families and single men of age. By the first article of the treaty, it is evident the Wyandottes intended to " be deemed and declared to be citizens of the United States, to all intents and purposes, and entitled to all the rights and privileges and immunities of such citizens, and shall in all respects be subject to the laws of the United States and Kansas, in the same manner as other citizens of said territory."

In other words, the families of the competent class, were to be placed upon the same basis of white families. If the six chiefs did not use such language in the treaty as would accomplish that object, they failed to carry out the intention of the tribe in entering into the treaty, and the court should give it such construction as will carry out the intention.

Prior to the treaty there was no fee simple interest in any Wyandotte; but all their lands were owned in common, and

regulated by the chiefs, although in most cases each family of the competent class occupied its particular share and built upon it, fenced it in and cultivated it year after year. Now, did these people, when they authorized the six to act for them, intend to make so great a jump as to take their lands, which had been owned in common by the whole tribe up to that time, and divide them into more minute parcels than the citizens' land had been, by giving every child, even were it but one month old, as much land as the father, of fifty years, who had endured the hardships of clearing, fencing and subduing the land, and increasing its value with buildings and orchards? It cannot be. The court is not to stop on the mere wording of the treaty, but to give it such construction as will carry out the intention of the Wyandottes in making it. (1 *Black. Com.*, 87, 60 ; *Lessee Burgett vs. Burgett*, 1 *Ohio R.*, 469 ; 15 *Ohio R.*, 341; 1 *Kent*, 460, 462, 463, 464.)

A treaty, although not a statute, is a compact between nations, which is entitled to the solemnity of a law of nations.

The principles of construction are much the same, whether applied to contracts or statutes. (2 *Parsons on Contracts*, 6 and 7.)

Treaties are to receive the same fair and liberal construction which applies to private contracts. (1 *Kent*, 174.)

The United States had no further interest in those lands than as trustee, to receive them from the Wyandottes, and reconvey them so that they would hold them in the same manner that white men held theirs. If the six Indians, through ignorance or inadvertance, did not use proper language to do that which was intended by the tribe, the court should give it the proper construction, taking into account the situation of the Wyandottes at the time, the subject matter of the treaty and their intention in making it. (2 *Parsons Cont.*, 11 and 12.)

No injury is done the other contracting party, the United States, in giving this construction, for the division of the

lands was solely for the benefit of the Indians. The minor cannot complain, for the father, by being made a full citizen, and receiving a fee simple title to lands which he before held only by permission, is in a better situation to support the minor who, at the death of his parent, would inherit a portion of his property.

Again, this construction was given the treaty by the government in issuing patents for the lands which have been issued to heads of families. It is also the construction given by the Wyandottes themselves and those purchasing of them, ever since 1855, a period of eight years. Many conveyances have been made by heads of families, and infinite mischief would result from a different construction. (*Lessee Moore vs. Vance,* 1 *Ohio R.*, 10.)

Where the treaty refers to individuals and members of the tribe, does it apply in all cases to minors having parents alive? Prior to the year 1847, the United States made all payments to the Indians, whether in money or property, simply to the chiefs, and left it to their discretion to divide it as they saw fit. In 1847 congress passed a law requiring payments to be made "to heads of families and *other* individuals," thus giving a construction to the kind of language employed in the Wyandotte treaty. If the heads of families were *individuals*, under that statute, whom did they represent? Most clearly not only themselves, but all their "family," which, of course, could only consist of the "head," wife and minor children. When heads of families are spoken of in that law, as individuals, the term embraces the whole "family." The other "individuals" named must mean single persons over age, and orphans.

That statute makes but two classes. The Wyandotte treaty makes four. The word, "other," in that statute clearly imports that the families were regarded as individuals represented by the "head," who received and disposed of all payments for the entire family, as seemed good in his own eyes.

This is the manner all payments have been received by the Wyandottes under said treaty. If the minor can have a division of the real estate patented by the United States, to the head, he can also have a division of the money received by the head. This would compel the father to feed, clothe and school the minor until of age, and then he would be entitled to as much money as the head. (*See Act of Congress, March* 3, 1847.)

The clause in article two of the treaty requires "that the said lands shall be subdivided, assigned and reconveyed, by patent, in *fee simple,* in the manner hereinafter provided for," &c. One of the methods "hereinafter provided for," was the clause in article three, saying: "The judgment and decision of said commissioners on all questions connected with the division and assignment of said lands, shall be final." They divided and assigned the lands to the head of the family. They also divided the nation into four classes:

*First.* families whose heads were intelligent, and all persons without families.

*Second.* Those families the heads which are not competent.

*Third.* Idiots, orphans and insane.

*Fourth.* Such as apply to be exempt, for a time, from citizenship.

The lists of each family should be arranged together. (*Art.* 3.)

The plat or schedule shall show the land assigned to each family or individual, and the quantity thereof, (*Art.* 3,) thus showing that at the time the treaty was made the parties did not contemplate a division of the lands into a smaller portion than the amount belonging to a family where such relation existed. In no place in the treaty is the land required to be divided into a smaller portion than that belonging to a family where there is one. The commissioners were not required to show on the plat the number of acres which it is claimed minors are entitled to. Clearly if the tribe intended minors

should receive the same quantity with the head, they would have so specified in the treaty, and had it surveyed out and marked on the map, and the patent would have been made to the minor ; but instead of this the treaty requires the amount of land for a family to be marked out on the map, thus giving a clear construction to the understanding of the treaty-making parties, which is in accordance with the testimony of the Wyandotte chiefs now living. They say the intention was to make "white folks" out of the Indians and place their families upon the same basis of the white citizen. Persons and guardians were to be appointed for the second and third classes, and none for the first, thus showing that the first class was to be left in charge of the head of the family, as other citizens are. The competency or incompetency of the minor, did not depend upon his own intelligence, but upon that of the head.

By article four, patents shall be issued by the United States land office, *under advisement* of the commissioner of Indian affairs, to the individuals of the tribe for the lands assigned them, as provided in article three. That article provides that commissioners shall assign or allot the lands, and their judgment shall be final. They allotted or divided the lands to the heads of families and made the plat and schedule as the treaty requires, and the patents issued to heads of families in *fee simple*, naming, simply, the minors, to show how many were counted in making up the quantity of land assigned to that head. The patents were to issue under the advisement of the commissioner, and he advised them to issue to heads of families for the quantity mapped out to that family, showing that he put that construction upon the treaty. (*Art.* 4.)

Article six provides that the three hundred and eighty thousand dollars should be paid to "individuals and members" of the tribe ; again showing that those terms represented families, where that relation existed, as well as single persons, where that relation did not exist, for all payments of annui-

ties which have been made to the Wyandottes since that treaty was made—comprising four or five—have been made to the head of the family for the entire family, and were receipted for by the head.

The same article provides for the payment of the shares of the families, where heads are not competent, and of idiots, orphans and insane, to guardians appointed by the council, and is silent as to whom the shares of the families whose heads are competent, shall be paid. The only construction must be that they are paid to the intelligent head of the family, according to the statute of 1847, which is precisely what has been done at every payment. The orphan and incompetent can call upon their guardian to school, clothe and board them, and on arriving of age can call on the guardian to render an account. Not so with the minor having a competent father. Such a thing has not been heard of as a minor applying to the probate court to have a guardian appointed to receive his money, and school, clothe and board him. The construction on all hands has been, that the children of the competents were to be supported just as the white citizen supports his children, and of course to do that he would convey and own the whole of the annuity to do it with which belonged to that family. He would stand in the same relation to his children that the white father does, and should be trusted to parcel out the money among his children, as his judgment might dictate.

In this case Summers and Wilson, the plaintiffs in error, having a deed from John Pipe, took all the interest he had in that tract of land, his wife, Jane Pipe, joining him in the deed. His wife, who died, was the person through whom George and James Spybuck claim, under the law of descents of 1855. The wife having died before John Pipe, her husband, had no interest in lands patented to her husband which would descend to her heirs. Hence her father and brother would take nothing by descent from her. Again the two chil-

dren of John Pipe—Maria and Winfield—have no interest in this land, because John Pipe sold and conveyed the same by trust deed to Summers and Wilson, and the debt due them from John Pipe is larger than the land is capable of satisfying. Hence the heirs of Mary Pipe, George and James Spybuck, have no interest at all in the estate, and Maria and Winfield have none until the debts of the estate are discharged.

The argument that injustice will be done minors by dividing land to those over age and none to minors, may be answered in this way : Suppose a family, at the date of the treaty, with two minors, aged respectively one and two years. Then suppose that two children were born after the making of the treaty. All agree they could have no land set apart to them out of the common stock, for it is already divided. Then by giving the two minors, born before the treaty, one half the lands allotted the "family," it lessens the ability of the father to bring up the two born after the treaty. Hence, there would be greater injustice in that light than by permitting the father to parcel out assistance to all the minor children alike, and let the dividing line be when they arrive of age, for they cease to be members of the family.

Again : The treaty provides that the land set apart to a family shall include improvements. About twenty-five acres is the standard for each allotment to a single person, of the best lands. Should the improvements be so scattered that they cannot be all included in one share, who is to have them ? Who gets the dwelling? who the barns? and who the orchard? Is the father, or another, to have all, or does each child have an interest? Decide that the minor has a fee simple interest in the lands, and all these questions arise, and will have to be adjudicated. It is another evidence that if the tribe had *intended* to divide those lands and improvements with minors, they would have so specified. Not having specified it, they could not have so intended. They left the wife

to her dower, provided by law, and the minor to the protection of the parent, also provided by law. They remembered the orphan, who otherwise would not have been provided for. Did they forget the minor, or did they consider him sufficiently provided for through the head?

To sum up the argument:

*First.* The Wyandotte Indians intended, by entering into the treaty, to have their lands placed in the United States government, as a trustee, to reconvey to the members of the tribe, so that they would hold them in the same manner white families and single persons of age hold theirs.

*Second.* If the six chiefs, acting for the tribe, used ambiguous language in carrying out the intention of the tribe, the court should construe it in accordance with the intention rather than the letter.

*Third.* The Wyandottes, and those purchasing of them, the commissioners to divide the land, the commissioner of Indian affairs, the president and all connected with the lands, up to this time, have put the same construction on the treaty, that the head of the family owned the land in *fee simple,* as expressed in the United States patent, and had a right to convey; therefore it would do infinite mischief to overturn that construction by the court. Courts will hesitate long before doing it. (*See Lessee Moore vs. Vance,* 1 *Ohio R.,* 10.)

*Fourth.* The plat and schedule are required only to show the land allotted each family. Had it been the intention of the Wyandottes to give minors a share of the lands, they would have required the patents to issue to minors direct, and then it would not matter whether the heads of the family were all together or not.

Entertaining these views, the judgment of the district court should be reversed.

*A. B. Bartlett,* for defendants in error.

The defendants in error, George Spybuck and James Spybuck, claim as the heirs of Mary Pipe, deceased, and Maria and Winfield Pipe claim as "individuals and members" of the Wyandotte nation of Indians, under the treaty of January, 1855, with the United States.

It is agreed that John Pipe, in his lifetime, conveyed to the plaintiffs in error all the interest he had in the premises; that whatever title he had, he derived from the United States by the patent, which makes part of the case.

The defendants in error believe and contend that under the treaty stipulations and provisions, the said John Pipe, as patentee, held the described premises in trust for himself, his wife, Mary, and his children, and all that he could convey was one undivided fourth part of the whole.

It is conceded that whatever title the individuals and members of the Wyandotte tribe of Indians have of and to their land, is derived from the treaty provisions, and not from the patents, and that it is within the power of the court to vacate a patent intended to be issued in pursuance of the provisions of a treaty, when those provisions are not properly construed.

This admitted, we have nothing further to do with the patent, except as it may tend to show the construction given to the treaty at the department. What is the title, intended by the language of the treaty, to be given to the individuals and members of the Wyandotte tribe of Indians of the competent class? Was it intended that the head of the family should take an absolute fee simple title to all the land patented to him as such head, or was it intended that each member of such family should be entitled to his or her fractional portion of the premises so granted?

The provisions of this treaty are novel and have never been construed by our courts.

The first article dissolves their tribal relation, (with some exceptions,) and makes them citizens.

The second cedes to the United States, to be reconveyed under the provisions of the treaty, the entire Wyandotte reserve, of which the land in controversy is a part. "The object of the cession is, that said lands shall be subdivided, assigned and reconveyed by patent, in fee simple, to the *individuals* and members of the Wyandotte nation in *severalty*."

The third article provides for the survey of the tract ceded and for the appointment of three commissioners, who "are to make a fair and just division and distribution of said lands among all the individuals and members of the Wyandotte tribe, so that those assigned to or for each shall, as nearly as possible, be equal in quantity and value, * * * * * and include those for each family altogether;" and "that the judgment and decision of said commissioners on all questions connected with the division and assignment of said lands shall be final."

The fourth article provides that when certain things have been done patents shall be issued by the general government from the land office, under the advisement of the commissioner of Indian affairs, to the individuals of the Wyandotte tribe for the lands severally assigned to them, as provided by treaty.

It may be contended by the plaintiffs in error that it was intended by the last clause, cited above, in the third article of the treaty, that the judgment and decision of the commissioners should be final, as to the question under discussion, and hence inferred that inasmuch as the allotments were made to the heads of families, as such *they* have settled the question.

By reference to the language of said article, it will be seen that plenary power is given to them on all questions connected with the *division* and *assignment* of said lands, clearly relating to the *quantity* and *value*, not to *title*. Were such the intention of the parties to the treaty, no other provision

in regard to the division of the land were necessary. The decision of the three commissioners, in fact, would be the treaty; the contract and their decision would be the verdict and judgment, from which there could be no appeal.

The statement of the case shows an investiture of power so full and so entirely unlike and beyond any power ever granted by congress to commissioners, ministers and plenipotentiaries, whose contracts are of no binding force until ratified by the senate and approved by the president, that I forbear to enlarge on the other construction contended for by the plaintiffs in error.

We now proceed to consider the main question.

What was the intention of the contracting parties? To subdivide the lands for the benefit of families or individuals?

By a careful examination of the treaty, it will be observed that the Wyandotte Indians are treated in two capacities.

*First.* As a nation, having a distinct national existence, with the right and power, through their delegates, to contract or treat.

*Second.* As "individuals and members" of said nation.

When the United States conferred *citizenship*, it conferred on *all*, "each and every," and permitted any one to exempt himself, if he so elected and conformed to the requirements of the treaty.

When the government agrees to pay money, it agrees to pay to the Wyandotte nation, through the intervention of the Indian agent and the Wyandotte chiefs; and when any are deemed incompetent to receive their money, it is made the duty of the chiefs to enroll all of a particular class *by their names*, thereby designating each *individual*. So soon as there is a departure from the general principle of paying money to the nation, and when the tribe or nation is not named, or after the provision for the extinction of the tribe, (*Art.* 1,) they everywhere consider the rights of "individuals and members." (*See lines* 14, 28, 44, *Art.* 1; 14, 17, 18, *Art.* 2; 14, 16, 23, 33, 34, 37, *Art.* 3.)

The exemptions are " such of said Indians," (*Lines* 28 *and* 29, *Art.* 1,) not a class, nation, family, heads of families or children, but individuals.

Tauromee signed a request to be exempted from citizenship. He had a wife and family of children. One of his sons is of the age of maturity, but was a minor at the date of the treaty. Is that young man—paying his taxes, defending his state and nation, subject to all the requirements of civil law—disfranchised by the act of his father? Was not citizenship conferred on the minor as well as the adult?—" each and every " member of the nation?—and did it not apply with more force to the minor of tender years, with the elevating influences of civilized life before him to prepare him for assuming the responsibilities of a citizen, than to the adult who had never known anything but the laws of half civilized nations? or will the *adults* live and die *citizens*, and when they are gone, and the minors are grown to manhood, shall we have another nation of Indians? Must the minors remain Indians because of the whims of the fathers? If " as head of the family " he could exempt his children, by the same reasoning he could exempt his wife, and she and her unborn children ever remain in the native political condition of the nation.

" To subdivide the lands and convey the same." (*Lines* 13, 14, 15, 16, 17 *and* 18, *Art.* 2.) Why use the word *subdivide?* First the land is to be surveyed into sections and quarter sections, according to the principles adopted for the survey of the public lands, and then to divide again, subdivide, not to families, but to the " individuals and members." This expression occurs four times in the treaty. (*Art.* 2, *Line* 17; *Art.* 3, *Lines* 14 *and* 37; *Art.* 6, *Line* 20.) What does it mean? " Individuals and members," " and members" can only be regarded as expletive of the " individuals." To show the individuals intended were to be members of the nation, and in every case where it occurs, the meaning would

not be changed by reading, " to individuals, being members, or who are members," and to no individuals, living in the nation, who are not members. In article four, ninth line, the word, " individuals," is not restricted or qualified by the words, ",of the Wyandotte tribe," &c., while to have continued the harmony of the treaty, the existence of the tribe should have been ignored as in all other cases, and "members," &c., used. Then the. expression can mean nothing more than to express, in language unmistakable, the severalty of the members of the tribe.

In all cases where the proceeds of the public property are to be distributed, the language is " the Wyandottes ;" clearly as a nation ; but in every instance in regard to the division of lands, the language is clear, " for individual," severally, each, &c. (*Art.* 3, *Lines* 14, 15, 23, 37 *and* 47 ; *Art.* 4, *Lines* 9, 10, 11, 14, 15, 16, 23 *and* 34.)

But it is insisted that the father, or "head of the family," ought, in justice, to have the control of the *land*, as well as the other property of the child, and devote it to raising, civilizing and educating the child. Our answer is, it is not so written in the contract, and such is not the law as applicable to the white race. Our statute law makes it obligatory on the probate court to appoint guardians for all minor children who hold property not derived from their parents. The parent cannot control his child's property against the order of the court. He is the guardian of his person, but can in no way interfere with his property, real or personal, unless he has been appointed guardian by the court. (2 *Kent*, 228.)

The Indian father is in the same condition. He, as a father, is bound by the first paternal law of nature to raise and educate his child, (*Whipple vs. Dow*, 2 *Mass.*, 415, 419 ; *Dow vs. Howard*, 4 *Mass.*, 97, 99,) and if a child receives a gift or title to property, by descent, and the father undertakes to intermeddle so as to waste or diminish it, the court inter-

feres and appoints a guardian to save that property for the child at maturity.

If the parents be dead, then the property must necessarily be used for the use of the child ; but while they are living, whether American or native American, it is the duty of every parent to properly take care of his offspring and keep and carefully preserve the property of the infant in his own right until maturity or a guardian is appointed.

The Wyandotte reserve was subdivided and distributed to the several members of the nation in consideration of the nation relinquishing certain privileges before that time granted and guarantied to them by the United States ; not for the services of any *one*, or part, but of the nation—to men, women and children all alike as nearly as possible, equal in value and quantity ; each alike entitled to the bounty, at the solicitation of the head men. The patents were made to the father, or in case of his death, to the widow, as "head of the family," and in case of the death of both before the date of the treaty, then to the several minor children, giving to each his patent for his separate allotment and fractional part. Suppose, at the date of the treaty, a family consisted of the father, as head, and wife and four children, and before the patent issued two of the minors became of age and no longer composed the family, are they barred of all interest in the land ? or does he rather hold it for them or their trustee ? Is it answered that they have had their raising and ought to give their land to the father to pay him for it ?

Then where is the equity in the case of a child who was of age at the date of the treaty, and receives his land, whereas another who happens to be ten months younger, receives none ? In the one case the child gets his share of the public property, and in the other he gets nothing. The clear intention of the treaty was to so classify the allotments that the several members of the same family should have their allotments arranged in *one* body, or adjacent, and each should

share the improvements alike. (*Art.* 3, *Lines* 23, 33 *and* 34.)

Guardians are provided for in the treaty (*Art.* 4, *Line* 58,) for the second class, but only for the care and custody of money, and in no instance for the land, and in all cases the patent has been issued to the competent, incompetent, idiot and insane alike, and the only exception is the minor children.

If it should be held that thereby the idiot acquired a right to his land, and the minor was barred of it, might not the idiot rejoice in his idiocy and the minor weep that he had a father?

Was it not the intention to give every individual and member of the nation a lot of land? If so, has any act of the secretary of the interior taken away that right?

Take the case of a father, mother and four children, and the land conveyed to A, the father, "as head of the family," as stated, what is their legal relation as to the land? The consideration is joint, moving first from the whole tribe, as such, and each individual member of the tribe contributing his proportional share each alike, and the patent is made to the father "as head of the family." Have not the wife and children severally an equal interest with the father? Or in the absence of any statute law regulating the property of married women, the husband (father) would hold his wife's interest as one, and the several interests of the children, subject to the decree of the court, according to the well established rule of common law. By that law, if an estate is purchased in the name of A, consideration paid by B, at the time of the purchase, there is a resulting trust in favor of B. (4 *Kent,* 305, *Lec.* 61.)

If it was the intention of the contracting parties to divide the lands in severalty, and they have been conveyed to *one* of a family, consisting of several, and the consideration is joint and *cotemporaneous,* is this not a resulting trust in favor of

all the persons named in the patent, of which the greater is named as the head ?

Again : The agreed statement shows that if there was only one person in the patent, he got only half as much as two, one-third as much as three, and so on, (assuming the value to be the same,) clearly showing that minors were reckoned as adults in the division, and in all respects, throughout the treaty, and until the secretary · of the interior undertook to give it a construction by granting the patent to the head of the family.   But it by no means follows because the patent is so issued that the department intended to vest the land in that " head."   On the other hand, the very language of the patent shows that all persons, named in the patent, except the " head," should be regarded as *cestui que trusts* of that head.

" In fee simple, as such head," is the language of the patent.   If it had been intended to vest the title in the head absolutely, would not the qualifying words have been omitted ? The better opinion would seem to be that the secretary intended to leave the title precisely where the treaty left it, and simply to divest the United States of their interest in the premises, and leave it for the courts to determine what portion each individual was entitled to. ·

Then we conclude John Pipe, in his life, was the trustee of Mary, his wife, and children ; that he could, and did, convey only his interest (one-fourth part) in the premises described ; that at his death the trust ceased ; that at the death of Mary her share descended to George Spybuck, her father, and James Spybuck, her brother, who thereby became joint tenants with the heirs of John Pipe.

By the Court, COBB, C. J.   The judgment of the court below was for the partition of land which, under the Wyandotte treaty of January 31st, 1855, was allotted and assigned to John Pipe by the commissioners appointed pursuant to article

third of that treaty, he being a member of that tribe placed in the competent class by said commissioners, and the head of a family, consisting of himself, Mary Pipe, his wife, and Maria and Winfield Pipe, his minor children by a former wife.

He had received a patent for the land so assigned purporting to convey it all to him, pursuant to the treaty, in fee simple absolute.

The plaintiffs in error claim to hold all the land under a trust deed made by John Pipe to them, to secure the payment of a sum of money which at the time of the trial was still unpaid.

George Spybuck and James Spybuck claim as heirs of Mary Pipe, who died childless, and Marie and Winfield Pipe, as members of the Wyandotte tribe, claimed to have the land conveyed to their father, as head of the family, partitioned, and to hold each one-fourth thereof.

The court held that John Pipe took and held title to the land, one-fourth to his own use and the other three-fourths in trust for Mary, Maria and Winfield Pipe respectively, and partitioned the land accordingly, leaving to the plaintiffs in error but one-fourth subject to their lien.

The only question raised by the argument is whether the competent head of a family, under that treaty, can take the title in fee simple absolute to the land allotted, assigned and patented to him according to the terms of the patent, or whether his wife and minor children, constituting his family at the time the treaty was ratified, by force of the treaty take the beneficial interest in aliquot portions, and the head of the family holds it in trust for them. The patent conveying the land in fee simple absolute, excludes the idea of a trust, and, therefore, if such trust exists it must result from the language of the treaty, and the failure of the officers of the United States to conform to it in making the conveyance. The patent pursues the language of the treaty as to the estate granted, and the sole question remains: Was the conveyance of the land for the family in conformity with the treaty?

This question, on account of the amount of property to be affected by it, is quite important, and from the obscure phraseology of the treaty, very difficult to determine.

Different portions of the treaty, at first view, seem to conflict. The whole instrument must therefore be considered, and the intention of the contracting parties sought by comparison of its several parts, and in the spirit and purview of the whole.

The first article provides for abolishing the tribal organization of the Wyandottes, and making them citizens of the United States.

By the second article, the Wyandottes cede all their lands to the United States and declare that the object of the cession is that the lands, with certain exceptions, "shall be subdivided, assigned and reconveyed by patent in fee simple, in the manner hereinafter provided for, to the individuals and members of the Wyandotte nation in severalty."

Article third provides for the survey of the lands into sections, half and quarter sections, and for the appointment of commissioners "whose duty it shall be" (in the language of the treaty,) "to cause any additional surveys to be made that may be necessary, and to make a fair and just division and distribution of the said lands among all the individuals and members of the Wyandotte tribe, so that those assigned to or *for* each shall, as nearly as possible, be equal in quantity and also in value, irrespective of improvements thereon; and the division and assignment of the lands shall be so made as to include the houses and, as far as practicable, the other improvements of each person or family, be in as regular and compact a form as possible, and include those for each separate family all together. The judgment and decision of said commissioners on all questions connected with the division and assignment of the lands shall be final.

"On the completion of the division and assignment of the lands as aforesaid, said commissioners shall cause a plat and

schedule to be made, showing the lands assigned to each *family or individual,* and the quantity thereof. They shall also make up carefully prepared lists of all the individuals and members of the Wyandotte tribe, those of each separate family being arranged together, which lists shall exhibit separately, first, those families, the heads of which the commissioners, after due inquiry and consideration, shall be satisfied are sufficiently intelligent, competent and prudent to control and manage their affairs and interests, and also all persons without families; second, those families the heads of which are not competent and proper persons to be entrusted with their shares of the money payable under this agreement; and third, those who are orphans, idiots, or insane."

The language used in the second article, "the individuals and members of the Wyandotte nation," standing alone would clearly include all persons of that tribe, infant members of families and married women as well as others, and entitled each to a share of the land, to be subdivided, but by the language of the same article, the land is to be subdivided, assigned and reconveyed by patent in fee simple "*in the manner hereinafter provided,*" and thus we are referred to subsequent parts of the treaty to ascertain the true meaning of this.

By article third, above cited, the commissioners are required to make a fair and just division and distribution of the said lands among all the individuals and members of the Wyandotte tribe, so that those assigned to or *for* each shall, as nearly as possible, be equal, &c.

This language imports that a portion of the "individuals and members" are to have land assigned to them and others *for* them.

The schedule and plat to be made by the commissioners is to show "the lands assigned to each family or individual."

They are not required to show what land they have assigned to each member of a family as a unit, but to the family as a

unit, and the "individuals" alluded to must of course be persons not members of families. The language used seems to admit of no other construction.

There are no means provided in the treaty by which the commissioner of Indian affairs, who is to advise as to the issuing of patents or the officer who is to issue them, can know what particular land (if any) are assigned to the several members of families, and therefore no conveyance to them could be made.

Article four of the treaty provides that "on the receipt, by the commissioner of Indian affairs, of the plat and schedule, lists of persons, &c., patents shall be issued by the general land office of the United States, under the advisement of the commissioner of Indian affairs, to the individuals of the Wyandotte tribe, for the lands severally assigned to them, as provided for in the third article of this agreement, in the following manner, to wit:  To those reported by the commissioners to be competent to be entrusted with the control and management of their affairs and interests, the patents shall contain an absolute and unconditional grant in fee simple, and shall be delivered to them by the commissioner of Indian affairs as soon as they can be prepared and recorded in the general land office, but to those not so competent the patents shall contain an express condition that the lands are not to be sold or alienated for a period of five years, &c."  The members of families other than the heads do not belong to either of these classes, they have neither been reported by the commissioners as competent or incompetent, and as no other provision is made by the treaty for issuing patents it seems manifest that none were intended to be granted to that class of persons.

The true construction of the treaty, we think, is that lands are taken, assigned and patented to the heads of families "*for or on account of* the other members of the family."  Such use of the word "for" is legitimate, and considering the practice of

the government established by law in the 1847, and continued ever since, of making all Indian payments, for the whole family, to its head. It is probable that both parties to the treaty so used and understood it. Such construction renders the whole treaty harmonious and consistent with the action of the officers of the government in conveying all the land for the family to John Pipe, its head.

We come to this conclusion upon a consideration of the language of the treaty only. But other consideration are not wanting to sustain it.

Before the making of the treaty the head of a Wyandotte family occupied such portion of land as was required by the wants of himself and family. He made improvements to the extent of his wants, and had the exclusive use and control of them. But if the construction of the treaty maintained by the defendant is to prevail, these improvements may be divided into as many parcels as there are members of the family, and he be left to support and educate his children by the use of one of such parcels, in most cases quite inadequate for that purpose; while the parcels assigned to minor children would, in many, if not most cases, lie unimproved and useless during their minority.

Such a distribution of land would be unjust to the heads of families, the poverty of parents tend to prevent the education of the youth, and greatly retard that advance of the Wyandotte people in civilization and prosperity which the treaty was designed to promote.

That the Wyandotte chiefs and head-men who made the treaty or the government of the United States designated such a construction is incredible.

The assignment and patent to John Pipe vested in him a title in fee simple absolute to the one hundred and forty-seven acres of land in question, and the trust deed of said John Pipe and Jane Pipe, his wife, to the plaintiffs gave

them a valid lein thereon; and the court, therefore, erred in excluding such lein from part thereof.

The judgment must be reversed with costs against the defendants, and a new trial granted for the purpose of partitioning the land between other parties, subject to the lein of the plaintiffs in error.

All the Justices concurring.