VIRGIL W. PARKER, County Treasurer, *et al.*, v. HENRY M. WINSOR.

*Error from Atchison County.*

Under the Kickapoo treaty of 1862, which provides that all lands sold under the provisions of article five of said treaty shall be forfeited to the government if not fully paid for in accordance with the provisions of said treaty, and which also provides that "none of said lands shall be subject to taxation until the patents have been issued therefor;" after said land has been sold to the Atchison & Pikes Peak Railroad Company, now known as the Central Branch Union Pacific Railroad Company, and by them sold to an individual who has made valuable and lasting improvements thereon, but before said lands have been paid for and before the patents have been issued therefor, *Held:* that neither said lands nor the improvements thereon are taxable.*

*1. TAXATION: SOVEREIGNTY.—Taxation is a necessary incident of sovereignty.

2. ID: POWER OF STATE.—The state has power to tax all property within its boundaries, unless prohibited by law.

3. ID: EXEMPTION FROM TAX.—In the act of February 10, 1864, [§ 1, L. '64 p ——,] the government of the state has recognized the power of the federal government, by treaty, to exempt lands sold by the United States from taxation, and held that this power exists independent of the locality of the property.

4. ID: PRIMARY DISPOSAL OF SOIL.—The state has entered into an ordinance never to "in-

The facts of the case, not appearing in the opinion following, are substantially as follows :

The defendant in error was in possession of, and had improved certain lands, which he had purchased of the Central Branch Union Pacific Railroad Company, who held under treaty with the Kickapoos of 1862 [13 *U. S. Stat.*, 623,] the same being a part of the Kickapoo Reserve, in Grasshopper township, Atchison county. The assessor of that township assessed four hundred dollars as " personal property tax " for " homestead improvements " on said land, consisting of a dwelling, outhouses, fences, and lands " broken up "—this by virtue of the tax laws of the state. [*Gen. Stat.*, 1038, § 56.] The lands had not yet been patented by the United States to the railroad company, nor to the defendant in error. The court below granted an injunction restraining the collection of the tax. The provisions of the treaty, under which it is claimed the lands and improvements were exempted from taxation, and other facts in the case appear in the opinion of the court.

*P. L. Hubbard*, for plaintiff in error.

*Otis & Glick*, for defendant in error.

*Hubbard, for plaintiff in error*, contended:

terfere with the primary disposal of the soil " within the state, nor with " any regulation Congress may find necessary for securing title to bona fide purchasers.

5. INDIAN LANDS : KICKAPOOS.—The Kickapoo Indians, and the United States holding under them, had the right to hold the lands of that tribe forever exempt from taxation.

6. TAXATION : GOVERNMENT LANDS.—When the legal title to lands passes from the United States to an individual, generally the land is taxable, although there may be a forfeiture back to the United States provided for in case of failure to perform; and when the equitable title has passed from the government, it is probable that the lands are taxable. In the sale of the Kickapoo lands to the Central Branch Union Pacific Railroad Company, by treaty of 1862, the company does not hold an entire, absolute, and unconditional equitable title, because the lands are liable to forfeiture. Art. 6., Tr. with Kickapoos.

7. IMPROVEMENTS : STATUTORY LAW.—Improvements on land, as houses, fences, etc., are, at common law, a part of the realty, and it was not intended, nor within the power of the legislature in the tax law [Gen. Stat., 1038, § 56,] to change this doctrine [See id., 1019, § 2;] but merely to provide the method of taxing improvements.

1.  To exempt these lands from taxation, after a
*bona fide* sale, although the patent has not been issued,
but after they have become a part of the State of Kan-
sas, is clearly beyond the authority of the United States,
and in direct conflict with the rights of a state which
have always been recognized by the courts heretofore.

2.  In this case, defendant in error claims that the
general government has the right to exempt said lands
from taxation until the patents issued therefor, and that
improvements erected thereon, are a part of the realty,
and as such, are exempt from the payment of taxes; that
the courts of common law have generally regarded im-
provements, such as houses, barns, etc., as a part of the
real property, is conceded; but that the legislature has
not the right to change the common law rule, and tax said
improvements as personal property, is denied.

There was error in the order of the judge in grant-
ing the temporary injunction, because it is not for every
threatened violation of the legal rights of a party that a
court of equity will interpose its remedy of injunction.
15 *Ohio Stat.*, 66; *Blake v. Brooklin*, 26 *Bark.*, 301.

Courts of equity ought not, except on the clearest
grounds, to interfere with the speedy collection of public
taxes.    23 *Conn.*, 232.

Courts will not interfere by injunction, to prevent
the sale of personal property for non-payment of taxes.
*Hill. on Inj.*, 385.    The distinction between taxes on per-
sonal property and on real estate is obvious.    In one case
a cloud is about to be drawn over a land title and the
court interferes to prevent it.    In the other a legal remedy
is full and complete, and no reason exists for the interpo-
sition of equity.    *Sackwood v. St. Louis*, 24 *Mo.*, 20.

3.  In the present case the order was granted to re-
strain the collection of taxes upon personal property of

defendant in error. If the assessment could be considered a nullity conferring no authority to sell the personal property of the defendant in error, the remedy would be to sue the officer for the trespass and disregard the pretended title of purchase. *Deon v. Todd*, 22 *Mo.*, 91.

The unlawful collection of a tax is a mere trespass not to be enjoined without allegation and proof of irreparable injury therefor. 24 *Mo.*, 20; 2 *U. S. Eq. Dig.*, 529; 4 *Gill and John.*, 1; 4 *Paige*, 399.

*By the Court,* VALENTINE, J.

In this case, the judge of the court below granted a temporary injunction to restrain the defendants in the court below (the plaintiffs in this court) from collecting certain taxes levied upon the improvements, on a certain piece of land, which was once a part of the Kickapoo reserve.

REAL ESTATE:    In 1862 the Kickapoo Indians, by a treaty with
Kickapoo Re-
serve.        the United States, [*See* 13 *U. S. Stat. at Large,* 623,] provided for the sale of all their "surplus" land in said reserve to the Atchison and Pike's Peak Railroad Company, now known as the Central Branch Union Pacific Railroad Company.

On the 7th day of September, A. D. 1865, said railroad company, in accordance with the provisions of said treaty, purchased said surplus land on a credit of six years. The purchase money has not yet been paid for the same, and neither have the patents been issued therefor. Winsor, who was the plaintiff in the court below, but is defendant in this court, purchased his said land from the railroad company, it being a part of said surplus land, and has made valuable and lasting improvements thereon. These improvements have been

taxed, and the injunction in this case was issued to restrain the collection of said tax.

INJUNCTION: Taxes. If the tax is illegal, injunction is no doubt a proper remedy. [*Civil Code*, '68, § 253, *Gen. Stat.*, 677.] It is authorized by statute, and therefore it makes no difference what the law would be in the absence of the statute; and for this reason the authorities cited by counsel for plaintiffs in error upon this point are not applicable. Hence the only question for us to consider is whether the tax is illegal or not; and, in fact, the only question of importance in the case is whether the property under consideration is subject to taxation, for no question is raised upon the regularity of the assessment and levy of the tax, except that it was taxed as "homestead improvements," while in fact it is not that kind of property. But even this irregularity is not pressed here.

We will first consider whether the land itself, upon which these improvements exist, is taxable; and involved in this question are questions of the gravest importance and of the greatest magnitude. Involved in this question are the questions of the power of the United States to make treaties with the Indians, and the nature, extent and limitations of such power; and also the nature, extent and limitations of the power of the State of Kansas to tax all property within its borders.

TAXATION: Extent of the power of. That taxation is a necessary incident of sovereignty will be readily admitted; that the State of Kansas is a sovereignty, limited only by the constitution of the United States and the laws and treaties legally made thereunder, will be equally admitted; and therefore, that the State of Kansas has a right to tax all property within its borders unless prohibited by the constitution of the United States, or some

law or treaty legally made thereunder, necessarily follows. The question then is whether any such prohibition exists.

No one will claim that the State of Kansas can tax the property of the United States. *Subdivision 6, § 3, of the Act of Admission; Joint Resolution Kas. Legislature, Gen. Stat.*, 71.

ID: INDIAN LANDS. And we suppose it is now settled by the Supreme Court of the United States that the State of Kansas cannot tax Indian lands, although held by the Indians in severalty, and under patents from the United States, so long as said Indians keep up their tribal organizations. [*The Kansas Indians, 5 Wallace, 737; overruling the cases of Bluejacket, and Wan-zop-pe-che, 3 Kansas, 299, 364.*] In fact it is settled in the Bluejacket case, [5 *Wallace*, 756,] that "Kansas accepted her admission into the family of states, on condition that the Indian rights should remain unimpaired, and the general government at liberty to make any regulation respecting them, their lands, property, or other rights, which it would have been competent to make if Kansas had not been admitted into the Union." [*See also Kansas Territorial Organic Act, § 19; and Act of Admission, § 1.*] It would seem from these two acts, that no rights, that the Indians possessed before the State of Kansas was admitted into the Union, or before the Territory of Kansas was organized, can be impaired, " so long as such rights shall remain unextinguished by treaty between the United States and such Indians."

ID: POWER OF President and Senate over, by treaty. It may seem to border very closely upon the ludicrous, if not upon the ridiculous, to see the government of the United States gravely treating with a few half naked, half starved savages, as though these savages were a great nation; and then

have it seriously claimed that the treaty, thus made, is a part of the supreme law of the land, paramount to any act of congress, or to any constitution or law of any one of the states; and, yet, no one, at this day, will question the power of the government or the validity of the treaty.

But a graver question arises when it is claimed that the president and the senate of the United States, by such a treaty, without the consent of the house of representatives, may dispose of the entire public domain of the nation, held or occupied by Indian tribes, giving said public domain to a few railroad companies; and, yet, we do not consider that we are at liberty, at the present day, to question even this power.

We are aware that some of the ablest and most eminent lawyers and statesmen of the nation still contend that, under the federal constitution, the president and senate do not possess any such power. But from the fact that such power has been assumed on the one side for many years; from the fact that such power has been acquiesced in on the other side, for the same length of time; from the fact that vast pecuniary rights have accrued under the belief that such power exists, which pecuniary rights must necessarily be disturbed and divested if a different doctrine should now be held; and from the fact that even our own courts have recognized such power to exist, [*Summers v. Spybuck*, 1 *Kas.*, 394; *Walker v. Armstrong*, 2 *Kas.*, 198, 224, 225,] we do not feel that we are at liberty to consider the question as still an open one. If such power is to be questioned; if the vast pecuniary rights that have accrued under the exercise of such power are to be shaken or disturbed, we will not be the court to do it. If this question is not already settled we prefer to leave it to the highest tribunal of this nation to settle, to the Supreme Court of the

United States, and particularly so, as we think we can decide the case, without deciding this question.

If, however, we could decide that such power does not exist, we would relieve ourselves from the trouble of any further investigation of this case. If the public lands of the United States, held and occupied by Indian tribes, cannot be sold to railroad companies, by means of a treaty alone, [*Subdivision* 2, § 2, *Art.* 2, *U. S. Const.*;] if it requires an act of Congress to dispose of such public lands, [*Subdivision* 2, § 1, *Art.* 4, *U. S. Const.*;] then, of course, the land in controversy cannot be taxed by the state; for the title to the same must still remain in the United States; and the attempted sale to the railroad company, by virtue of the said Kickapoo treaty, must necessarily be a nullity.

But supposing the treaty and the sale made under it to be valid, then, is the land taxable? The treaty provides [13 *U. S. Stat. at Large*, 626, *Art.* 6,] that "none of said lands shall be subject to taxation, until the patents have been issued therefor." And, hence, those who claim that the lands are taxable, notwithstanding the treaty, must claim that this portion of the treaty is a nullity; that it is unconstitutional and void, and that the government had no power to make it. But why any one should claim any such thing we are unable to comprehend. No decision, or even intimation of any court, that we are aware of, sustains such a claim; and we are not aware that taxes have ever been levied on any such lands, that is on lands that have not been paid for nor patented, and that are liable to be forfeited back to the United States, and that are exempted from taxation by the United States until the patents shall be issued. Even in the case at bar, the tax is not intended to be levied on the land itself, but only on the improvements. The au-

thorities of Atchison county, themselves, seem to admit that the land is not taxable, or they would have taxed the land with the improvements, instead of taxing the improvements alone.

KANSAS INDIANS: The Supreme Court of this state in the case
5 Wallace, 759
Reviewed. of Miami county v. Wan-zop-pe-che, [3 *Kas.* 364,] seem to have recognized the power of the United States by treaty to exempt such lands from taxation. The treaty with the Miami Indians, executed Jan. 15, 1854, [10 *U. S., Stat. at L.,* 1094, *Art.* 2,] provides that " The lands patented (to said Miamis) shall not be liable to levy, sale, execution, or forfeiture." The treaty with the Wyandottes, executed Jan. 31, 1855, [10 *U. S. Stat. at L.,* 1161, *Art.* 4,] provides that " None of the lands to be thus assigned and patented to the Wyandottes, shall be subject to taxation for a period of five years, from and after the organization of a state government over the territory where they reside, and those of the incompetent classes shall not be aliened or leased for a longer period than two years, and shall be exempt from levy, sale or forfeiture, until otherwise provided by state legislation, with the assent of Congress." The treaty with the Chippewas, executed February 22, 1855, [10 *U. S. Stat. at L.,* 1167, *Art.* 2,] provides that " Said tracts to be exempted from taxation, levy, sale or forfeiture. And the treaty with the Winnebagoes, executed February 24, 1855, [10 *U. S. Stat. at L.,* 1173, *Art.* 4,] provides that " Said tracts to be exempt from taxation, levy, sale of forfeiture, until otherwise provided by the legislature or the state in which they may be situated, with the assent of Congress." Chief Justice Crozier, who delivered the opinion of the court in the Blue Jacket case, [3 *Kas.,* 368] comments upon all these treaties. He enters into an elaborate argument to prove that the words "levy, sale,

and forfeiture," as used in the Miami treaty, do not mean respectively a levy of taxes, sale for taxes, or a forfeiture for taxes; but nowhere does it seem to have occurred to him that the government had no power to make such a treaty, or to exempt such lands from taxation; indeed, he seems to admit that the government has just such power.

This case afterwards was taken to the Supreme Court of the United States, [*The Kansas Indians in the case of the Miamis*, 5 *Wall.*, 759,] and that court went further than the Supreme Court of Kansas did, not only holding that the government of the United States, by treaty, had the power to exempt such lands from taxation, but that it had actually done so; holding, that the words levy and sale, as there used, had a broader signification than that given to them by the Supreme Court of Kansas; holding that these words mean respectively a levy of taxes and a sale for taxes, as well as a levy of an execution and a sale on execution, thereby overruling the decision of the Supreme Court of Kansas in this respect.

The legislature and the executive departments of this state have also recognized the power of the federal government, by treaty, to exempt such lands from taxation. By an act approved by the governor February 10th, 1864, the legislature enacted as follows: "Section 1. That whereas the Congress [president and senate] of the United States, by treaty with the Wyandotte Indians, approved March 1st, 1855, exempted all the lands on the Wyandotte reserve from taxation for a period of five years from and after the organization of a state government over the territory where they reside; therefore, Section 2. That the state auditor is hereby authorized and instructed to credit Wyandotte county with the amount of taxes charged against said county, on all o

the lands on the Wyandotte reserve, as soon as the county commissioners of said county shall furnish the state treasurer with an accurate statement of the number of acres contained in said reserve and assessed in 1861, the same being exempt from taxation as aforesaid."

IRWIN V. MARshall, 20 How., 558, examined. The Supreme Court of the United States have decided, in the case of Irwin v. Marshall, [20 *How.*, 558,] that "the United States, being the owner of the public lands within the states and territories, have the right to say to whom, in what mode, and by what title, they shall be conveyed;" and "the control, enjoyment and disposal by the United States of their own property is independent of the locality of such property, whether it be situated in a state or territory;" and that "the rights, duties and powers of the United States can in no wise be influenced by an inferior and subordinate authority."

PRIMARY DISPOsal of the soil. And Congress have enacted, [*Subdivision* 5, § 3, *Act of Admission*,] and Kansas has ordained [*Joint Resolution of the Legislature, Gen. Stat.*, 71] by an ordinance, *irrevocable* without the consent of the United States, " that this state shall never interfere with the primary disposal of the soil within the same by the United States, or with any regulation Congress may find necessary for securing the title to said soil to *bona fide* purchasers thereof; and no tax shall be imposed on lands belonging to the United States."

It will be readily admitted that the Kickapoo Indians had the legal power to hold their lands forever, without said lands becoming liable to taxation. It will also be admitted that the United States had the power, with the consent of the Indians, to purchase this land, and then hold it forever, without its becoming liable to be taxed; and we think it ought also to be admitted, that so long as

the Indians, or the United States, or both jointly, hold the legal and equitable title to the land, that it is exempt from taxation, although there may be a contract between the United States, the Indians, and some individual or corporation, that the United States shall convey this land to such individual or corporation, at some future time, provided certain things shall be done before that time. It is probably true that when the legal title to the land passes, by patent, from the United States to an individual, the land becomes taxable, although, by some law, the individual may be liable to forfeit it back to the government, by a failure to perform some act on his part, required by law, or the terms of the contract. It is also probably true, that when the equitable title passes from the United States to an individual, the land becomes taxable, although the patent may not yet have been issued.

KICKAPOO Reserve.          But in this case, neither the legal nor equitable title has passed. The legal title has not passed, because the patent has not yet been issued, and the equitable title has not passed, because it has not yet been paid for, and because it is clearly the intention of the parties, as indicated in the treaty, that such title shall not pass until the land is fully paid for. It is true that the purchaser has a contingent or conditional equity in the land; but here, where we use the words "equitable title," we mean the entire, absolute and unconditional equities, leaving nothing in the United States but the mere naked, legal title, without any equities. It cannot be said that a party has a complete, equitable estate as long as he is in danger of forfeiting the same. Article six of the treaty provides that " in case said railroad company shall fail to complete either section of said railroad in a good and efficient manner, or shall fail to pay the whole of the purchase money for said lands within the

time herein prescribed, or shall fail to pay all or any part of the interest upon the same each year as aforesaid, within thirty days from the date when such payment of interest shall fall due, then the contract or purchase shall be deemed and held absolutely null and void, and shall cease to be binding on either of the parties hereto, and said company or its assigns shall forfeit all payments of principal and interest made on such purchase, and all right and title, legal and equitable, of any kind whatsoever, in and to all and every part of said lands, which shall not have been, before the date of such forfeiture, earned and paid for, pursuant to the provisions of this treaty."

TAXES: IMPROVE-
ments on gov-
ernment and
Indian lands.

If we consider that the land is not taxable, the next question is whether the improvements made thereon are taxable. Said improvements consist of a dwelling house, a barn, out-buildings, fences, and a portion of the soil is "broken up." That these improvements are at common law a part of the real estate, no lawyer will deny; it is so conceded by counsel for plaintiffs in error. But it is claimed that the legislature have changed the common law, and converted these improvements into personal property. The statute, however, does not attempt to do any such thing. The section under which it is claimed that this is done, if done at all, [§ 56, *Gen. Stat.*, 1038,] provides that certain improvements—and the section is broad enough to include these improvements—shall be "taxed as personal property;" that is, it shall be taxed in the same manner that personal property is taxed. It does not mean that the improvements shall be personal property. Section two of the same act [*Gen. Stat.*, 1019] provides that "the terms 'real property,' 'real estate,' and 'land,' when used in this act, shall include not only the land itself, but

all *buildings*, fixtures, *improvements*, mines, minerals, quarries, mineral springs and wells, rights and privileges appertaining thereto." From this section, we think it is clear that the legislature themselves understand this class of improvements to be "real property," "real estate," "land."

But is it possible for the legislature to change real estate into personal property? Is it possible for them to do a thing indirectly which they cannot do directly? If they can change one portion of real estate into personal property, they could change the whole of it into personal property; they could change the entire public domain of the nation within the boundaries of Kansas into personal property, and then tax it. It is true that they may so change the names of things, that all their own acts concerning such things shall be construed with reference to such new names; but the property or thing, whose name is changed, remains the same, and the legislature has no more and no less control over it after the change than before.

With all these difficulties in the way, will it be contended that these lands, or the improvements thereon, can be encumbered with a tax? that these lands or the improvements can be sold for taxes? that a tax lien may attach to them, so as to injure their resale, provided they are forfeited back to the government? that a tax title can be obtained to them, so as to divest the government of its title? so that the government cannot convey title to its purchasers, when it executes the patents, free from all incumbrances. We are satisfied that this class of improvements is not taxable and, therefore, that the order of the judge of the court below, granting the temporary injunction, must be affirmed.

SAFFORD, J., concurring.