[See 2 Fed. 851.]

---

HICKS (ANTONE v.).    See Case No. 493.
HICKS (BUSSEY v.).    See Case No. 2,230.

---

## Case No. 6,458.

### HICKS v. BUTRICK.

[3 Dill. 413.] [1]

Circuit Court, D. Kansas. 1875.

WYANDOT TREATY — LANDS PATENTED TO HEADS OF FAMILIES—NATURE OF TITLE GRANTED.

By terms of the treaty of January 31, 1855 (10 Stat. 1159), between the United States and

---

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

the Wyandot tribe of Indians, viewed in the light of the practical construction which it has received and of the patents to lands issued thereunder to the competent heads of families: *Held*, that such patents conveyed to the head of the family the land in fee and not in trust for the wife and other members of his family; approving Summers v. Spybuck, 1 Kan. 394.

[Cited in Elk v. Wilkins, 112 U. S. 100, 5 Sup. Ct. 44; Wau-pe-man-qua v. Aldrich, 28 Fed. 498.]

The Wyandot Indians, formerly numerous and powerful, while the French and English were contending for the domination of the continent, emigrated from their homes in Canada, crossed the Detroit river into Michigan, fought their way against all opposing forces along the southern shore of Lake Erie, and finally became permanently located under the protection of the United States in Northern Ohio. On January 21, 1785, the United States, by treaty of that date, conceded to the Delawares and Wyandots a large tract of territory, embracing millions of acres, in Northern Ohio. Of these lands, on the 17th of March, 1842, there remained to the Wyandots, in the county of Crawford, 109,144 acres, which, by treaty of that date, were ceded to the United States. In the mean time (near 60 years), the Wyandots made rapid progress in civilization, but had decreased in numbers and wealth. The title of the Wyandot Indians to the lands in question was derived as follows: By treaty of September 24, 1829 (7 Stat. 327), it is provided that the country selected in the fork of the Kansas and Missouri rivers (in which are the lands in question) "shall be conveyed and forever secured by the United States to the said Delaware Nation as their permanent residence." By article 2 of the compact between the Delaware and Wyandot Nations, December 14th, 1843, the Delawares did "cede, grant and quit claim to the Wyandot Nation thirty-six sections of land," in which thirty-six sections are the lands in controversy. This contract was confirmed by act of congress, approved July 25, 1848 (9 Stat. 336), with the proviso that the Wyandot Nation shall take no better right or interest in the lands than was then vested in the Delawares. The Wyandot Nation, by this act of congress, had secured to it the right to possess, occupy and reside upon these thirty-six sections of land. Within seven years was concluded the treaty of January 31, 1855 (10 Stat. 1159), under which the present controversy arises, which requires a construction of some of its provisions. John Hicks was a member of the Wyandot tribe in January 31, 1855, and had a wife and five children, of whom the complainant [Matilda Hicks] is one, and who was then about eleven years of age. In the allotment of lands under the treaty of 1855 John Hicks and family were entitled to 257 acres, of which the complainant claims by the present bill to be entitled to an undi-

vided one-seventh part. The case was submitted upon bill and answer.

It appears by the pleadings, that John Hicks, the competent head of a family, under the treaty between the United States and the Wyandot Nation, of the 31st of January, 1855, received, on the 1st day of June, 1859, a patent to 257 acres of lands assigned to him and for his family under said treaty, including the lands in suit, reciting that said land had been allotted to John Hicks, the head of the family, naming his wife and five children, and conveying the same "unto the said John Hicks, as the head of the family aforesaid, and to his heirs and assigns forever, as an absolute and unconditional grant, in fee simple, to have and to hold the said tract or parcel of land, with the appurtenances, unto the said John Hicks, as the head of the family aforesaid, and to his heirs and assigns forever." Through divers mesne conveyances, the defendant [Hiram Butrick] has acquired the title of John Hicks to the lands in question. The commissioner of Indian affairs had directed the commissioners under the treaty to assign the land to the heads of families, and all the lands of families with a competent head were conveyed to the heads in the same manner as those conveyed to John Hicks. The Wyandot Nation, knowing of such construction, never dissented therefrom. The supreme court of the state of Kansas, in the month of September, 1863, gave the same construction to the treaty (see 1 Kan. 394), and the defendant purchased on the 20th day of April, 1865, for a full consideration, paid without notice of any adverse claim, relying on such construction and believing he was getting a good title, made improvements, and has ever since resided thereon. On the 13th day of January, 1864, John Hicks and his wife conveyed said land thus assigned and patented to John Hicks as the head of a family to a person under whom the defendant claims. The theory of this bill is that John Hicks, by the patent, acquired the title to the land in trust as to one undivided seventh part for the complainant, one of his children, and that she is entitled to have this trust enforced against the grantee of her father. The prayer is that the complainant's right be declared and established, and that partition be made.

J. P. Usher and L. C. Slavens, for complainant.

Cobb & Shannon, for defendant.

DILLON, Circuit Judge. The patent issued by the United States recites the treaty of January 31, 1855, that John Hicks was a member of the competent class, that the 257 acres of land were allotted, under the treaty, "to John Hicks, the head of a family consisting of (here naming his wife and five children, of whom the complainant is one)," and concluding as follows: "Now, know ye:

That, the United States of America * * by these presents do give and grant the tracts of land above described unto the said John Hicks as the head of the family as aforesaid—to have and to hold the said tracts of land unto the said John Hicks, as the head of the family as aforesaid, and to his heirs and assigns forever."

In executing the treaty of 1855, the United States construed it as dividing the competent Indians into two classes, to-wit: 1st, individuals or persons without families. 2d, heads of families, the names of the members of each separate family being arranged together. The test of competency in the head of the family was, sufficient intelligence and prudence, on the part of the head, to control and manage the affairs and interest of the family. Article 3. By the treaty lands were to be assigned and distributed "among all the individuals and members of the Wyandot tribe, so that those (lands) assigned to or for each shall, as nearly as possible, be equal in quantity or value, irrespective of improvements thereon; and the division and assignment of lands shall be so made as to include the houses, and, as far as practicable, the other improvements of each person or family * * and include those for each separate family all together." The commissioners are required to make a plat and schedule "showing the lands assigned to each family or individual."

Taking all the provisions of the treaty together, it quite satisfactorily appears to my mind that it contemplates that the competent heads of families shall take the lands by patent directly from the United States, and that the commissioner of Indian affairs and the land department properly construed the treaty, in investing John Hicks as the head of the family with the legal title to the land. It can hardly be supposed that the father of the family in his life time had no more interest in the land and the improvements than his wife or any one of his children, however young; or, as applied to the present case, that John Hicks, the father, who made the improvements, had only an undivided one-seventh part of the property.

Considering the known authority and power of the head of the family according to the laws, usages and customs of the Nation, and the injustice of such a division, putting an infant child upon an equal footing with the father, I am of opinion that the theory upon which this bill is exhibited is unsound. Certain it is that the construction of the treaty was against the view maintained by the complainant; that this construction was acquiesced in both by the government and the Wyandot Nation; that in 1863 the precise question here made was decided by the supreme court of Kansas (Summers v. Spybuck, 1 Kan. 394), against the principle on which the bill in this case is founded, and that this view has since that time been ac-

cepted and acted upon by purchasers of these lands as sound and unquestioned law.

The practical construction of the treaty and the co-incident judicial construction of it by the supreme court of Kansas, find much support in Wilson v. Wall, 6 Wall. [73 U. S.] 83. And see 9 Stat. 203, as to payments to heads of Indian families. At all events my judgment is that the practical construction of the treaty, so long acquiesced in, and on the strength of which so much money has been invested in good faith, should not be overturned in favor of a new construction, which to say the least is attended with grave doubts and would result in unsettling so many titles. Bill dismissed.

See Gray v. Coffman [Case No. 5,714]; Mungosah v. Steinbrook [Id. 9,924.]