### ROSS *v.* EELLS et al.

(Circuit Court, D. Washington, N. D.   June 13, 1893.)

1. INDIANS—DEEDS FROM UNITED STATES — CONSTRUCTION —PUYALLUP RESERVATION.

Pursuant to the treaty of December 26, 1854, (10 Stat. 1132, art. 6,) the president, on January 30, 1886, made deeds to certain Indians of lots of land embraced in the Puyallup reservation, Wash. T., conveying the same to them individually, with the stipulation that the lands should not be aliened or leased for more than two years, and should be exempt from levy, sale, or forfeiture; these conditions to continue in force until a state embracing these lands was admitted to the Union, and until they were removed by the legislature thereof with the consent of congress. By the treaty above mentioned, these conveyances were to be made subject to the same regulations as prescribed in article 6 of the treaty with the Omahas. This article provided that if the grantee neglected to occupy and till a portion of the granted lands, or roved from place to place, the president might cancel the deed, and withhold the annuities due him until he returned to the land, and, in default of such return, might assign the same to another person or family, or sell the same for the common benefit, etc. *Held,* that these deeds passed the title in fee to the grantees, subject only to conditions subsequent, and left no title or reversionary interest in the United States, but a mere power in the president to reassign or sell for the common benefit of the tribe, on breach of the conditions.

2. SAME — CONSTRUCTION OF RAILROAD ON RESERVATION — INTERFERENCE BY GOVERNMENT—INJUNCTION.

By the act of February 8, 1887, (24 Stat. 390, § 6,) the grantees in said deeds were made citizens of the United States, with all the rights, privileges, and immunities of other citizens, and subsequently the territory was admitted as a state. *Held,* that the former step deprived the government of the power to coerce such Indians into making or annulling contracts, or to molest persons who were upon the granted premises by the license of the grantees, and the latter step transferred to the state government the power to preserve peace and good order, regulate the making of private contracts, and the use and descent of private property; and that, therefore, there remained no power in the United States to interfere with a person who was building a railroad across the granted lands with the consent and approval of the Indian grantees, and an injunction pendente lite would be granted to restrain an army officer from attempting such interference.

**B. SAME.**

Nor can any right in the United States to prevent the building of such railroad be predicated upon the so-called "Wilson Act" of March 3, 1893, (27 Stat.. 633,) which provides for the appointment by the president of commissioners to make selections of portions of said lands for sale, and to make sales and execute conveyances.

In Equity. Bill for an injunction by Frank C. Ross, against Edwin Eells, Indian agent, and Maj. French, Capt. Carpenter, and Lieut. Goodwin, officers of the United States army, to prevent interference by defendants with the building of a railroad across land within the Puyallup Indian reservation, which has been allotted to individual Indians in severalty. Application for injunction pendente lite granted.

Baker & Campbell, for complainant.
Patrick Henry Winston, for defendants.

HANFORD, District Judge. The complainant is engaged in constructing a railroad intended for use as a public highway from the city of Tacoma across what has been heretofore the Puyallup Indian reservation, but the line of the intended railroad crosses only land which has been allotted to the different heads of families in severalty, and for which patents have been issued by the president. The defendant Eells is an Indian agent of the United States, and the other defendants are officers of the United States army. By direction of the president, they have interfered with the building of said railroad, and threaten and intend to prevent the same by force, and this suit is brought for an injunction to restrain them from such interference. The title to the land upon which the proposed road is to be located, and the rights of the parties as affected thereby, can be stated in the most concise manner by copying an extract from the report of the commission appointed by President Harrison in pursuance of an act of congress approved August 19, 1890, (26 Stat. 354:)

"The Puyallup reservation was set apart under the treaty of December 26, 1854, between the United States and the Nisqually and other bands of Indians, (10 Stat. 1132,) and executive orders of January 20, 1857, and September 6, 1873. It lies in townships 20 and 21 north, ranges 3 and 4 east of the Willamette meridian; and, as finally established, it contained about 18,050 acres. The treaty of December 26, 1854, contained this provision: 'Art. 6. The president may, * * * at his discretion, cause the whole or any portion of the lands hereby reserved, or of such other lands as may be selected in lieu thereof, to be surveyed into lots, and assign the same to such individuals or families as are willing to avail themselves of the privilege, and will locate on the same as a permanent home, on the same terms and subject to the same regulations as are provided in the sixth article of the treaty with the Omahas, so far as the same may be applicable.' In pursuance of this article the Puyallup reservation was surveyed into lots, and the survey was approved on the 30th of January, 1874, by the surveyor general of Washington Territory. Up to the 30th day of January, 1886, no lands in the reservation were patented to Indians in severalty; but on that day the president signed 166 patents to individual Indians for tracts, the aggregate quantity conveyed by all of which was a fraction less than 17,463 acres. The recitals and operative clauses in each of said patents were the same as in all the others. To show the terms of them all, a copy of one is here presented, as follows:

"'The United States of America, to all to whom these presents shall come, —Greeting: Whereas, by the sixth article of the treaty concluded on the twenty-sixth day of December, Anno Domini one thousand eight hundred and fifty-four, between Isaac I. Stevens, governor and superintendent of Indian affairs of Washington Territory, on the part of the United States, and the chiefs, headmen, and delegates of the Nisqually, Puyallup, Steilacoom, Squaqksin, S'Homamish, Stehchas, T. Peeksin, Squiaitl, and Se-hch-wamssh tribes and bands of Indians, it is provided that the president may, at his discretion, cause the whole or any portion of the lands hereby reserved, or of such other land as may be selected in lieu thereof, to be surveyed into lots, and assign the same to such individuals or families as are willing to avail themselves of the privilege, and will locate on the same as a permanent home, on the same terms and subject to the same regulations as are provided in the sixth article of the treaty with the Omahas, so far as the same may be applicable; and whereas, there has been deposited in the general land office of the United States an order bearing date January 20, 1886, from the secretary of the interior, accompanied by a return dated October 30, 1884, from the office of Indian affairs, with a list approved October 23, 1884, by the president of the United States, showing the names of members of the Puyallup band of Indians who have made selections of land in accordance with the provisons of the said treaties, in which list the folowing tract of land has been designated as the selection of the Che-gay-lad or John Towallad, the head of a family consisting of himself and Mary Ann, viz. the southwest quarter of the northwest quarter of section one, in township twenty north, of range three east of the Willamette meridian, Washington Territory, containing forty acres: Now know ye, that the United States of America, in consideration of the premises, and in accordance with the directions of the president of the United States, under the aforesaid sixth article of the treaty of the sixteenth day of March, Anno Domini one thousand eight hundred and fifty-four, with the Omaha Indians, has given and granted, and by these presents does give and grant, unto the said Che-gay-lad or John Towallad, as the head of the family as aforesaid, and to his heirs, the tract of land above described, but with the stipulation contained in the said sixth article of the treaty with the Omaha Indians that the said tract "shall not be aliened or leased for a longer term than two years, and shall be exempt from levy, sale, or forfeiture, which conditions shall continue in force until a state constitution embracing such lands within its boundaries shall have been formed, and the legislature of the state shall remove the restrictions," and "no state legislature shall remove the restrictions * * * without the consent of congress;" to have and to hold the said tract of land, with the appurtenances, unto the said Che-gay-lad or John Towallad, as the head of the family as aforesaid, and to his heirs, forever, with the stipulation aforesaid. In testimony whereof, I, Grover Cleveland, president of the United States, have caused these letters to be made patent, and the seal of the general land office to be hereunto affixed. Given under my hand, at the city of Washington, this thirtieth day of January, in the year of our Lord one thousand eight hundred and eighty-six, and of the independence of the United States the one hundred and tenth.

"'By the President.                             Grover Cleveland.

    [Seal.]                             "'By M. McKean, Secretary.'

"The reference in the patent to the sixth article of the treaty with the Omahas makes it proper to insert here that article. It is as follows: 'Art. 6. The president may, from time to time, at his discretion, cause the whole or such portions of the land hereby reserved as he may think proper, or of such other land as may be selected in lieu thereof, as provided for in article first, to be surveyed into lots, and to assign to such Indian or Indians of said tribe as are willing to avail of the privilege, and who will locate on the same as a permanent home, if a single person over twenty-one years of age, one-eighth of a section; to each family of two, one-quarter section; to each family of three, and not exceeding five, one-half section; to each family of six, and not exceeding ten, one section; and to each family over ten in number, one-quarter section for every additional five members. And he may pre-

scribe such rules and regulations as will insure to the family, in case of death of the head thereof, the possession and enjoyment of such permanent home and the improvements thereon. And the president may, at any time, in his discretion, after such person or family has made a location on the land assigned for a permanent home, issue a patent to such person or family for such assigned land, conditioned that the tract shall not be aliened or leased for a longer term than two years, and shall be exempt from levy, sale, or forfeiture, which conditions shall continue in force until a state constitution, embracing such lands within its boundaries, shall have been formed, and the legislature of the state shall remove the restrictions. And if any such person or family shall at any time neglect or refuse to occupy and till a portion of the lands assigned, and on which they have located, or shall rove from place to place, the president may, if the patent shall have been issued, cancel the assignment, and may also withhold from such person or family their proportion of the annuities or other moneys due them, until they shall have returned to such permanent home, and resumed the pursuits of industry; and, in default of their return, the tract may be declared abandoned, and thereafter assigned to some other person or family of such tribe, or disposed of as is provided for the disposition of the excess of said land. And the residue of the land hereby reserved, or of that which may be selected in lieu thereof, after all of the Indian persons or families shall have had assigned to them permanent homes, may be sold for their benefit, under such laws, rules, or regulations as may hereafter be prescribed by the congress or president of the United States. No state legislature shall remove the restrictions herein provided for, without the consent of congress.'"

The several Indian allottees have by the provisions of the sixth section of an act of congress approved February 8, 1887, (24 Stat. 390,) been made citizens of the United States, with all the rights, privileges, and immunities of other citizens, and, in assertion of their rights as citizens and proprietors of their patented lands, they have made contracts with the complainant authorizing the location and construction of said railroad, and, at the time of the interference complained of, were actively assisting him in his work. The answer of the defendants admits the above recited facts, and admits an intention on their part to prevent the construction of said railroad without assigning any reason for so doing, except that they are acting as officers of the United States under the direction of the president, and I believe that no reason can be ascribed for official intermeddling in this business, except this: that the departments of the government in charge of Indian affairs feel in duty bound to take this course as a means of testing questions which have arisen as to the extent of the authority remaining in the government to control these particular Indians and their property, and the extent of the changes wrought in the status of said Indians by the conveyances to them in severalty of the title to their lands, the conferring upon them of the rights, privileges, and immunities of citizenship, and the admission of Washington into the Union, on terms of equality with the original states. Formerly, the national government had the supreme and absolute power and right to control the Indians by reason of their condition as dependents and wards of the nation, by reason of its title in fee to all the lands reserved for their use and occupation, and by reason of the plenary power vested in congress to make laws for all the people in the territories. But step by step all these controlling powers have been divested.

First, the patents issued by the president pursuant to the treaty made with the Indians passed the title in fee from the United States to the patentees, subject only to the restrictions and conditions subsequent, expressly declared in said treaty. No estate or reversionary interest in the patented lands is reserved or now held by the United States. The restrictions prevent alienation of the lands until authorized by a law of the state to which congress must consent, otherwise than by leases for terms not exceeding two years. The conditions subsequent are that, for specified causes, any patent may be by the president canceled, and the land so forfeited may be assigned to other Indians, or sold for the benefit of all the Indians of the tribe in common. Instead of reserving the right to terminate the estate by a re-entry for breach of the condition, as is usual in conveying an estate subject to a condition, each of these patents creates a power in the president to reassign the land or sell it. This power is not inconsistent with the complete investure of title in the patentees. Chancellor Kent says:

"Subsequent conditions are those which operate upon estates already created and vested, and render them liable to be defeated. * * * So long as these estates upon subsequent conditions continue unbroken, they remain in the same situation as if no such qualification had been annexed." 4 Kent, Comm. (13th Ed.) 126.

By this step the government lost entirely the power to control the use of the land.

The second step whereby Indian proprietors of land were made citizens deprived the government of the power to coerce such Indians into making or annulling contracts, or of molesting persons upon their premises by their license when not interfering with the operations of the government or violating any national law. The rights, privileges, and immunities of citizenship in this country include, among others, the right "to make and enforce contracts, to sue, be parties, give evidence, and to inherit, purchase, lease, sell, and convey property." These are fundamental rights, and of the essence of civil liberty. Civil Rights Cases, 109 U. S. 22, 3 Sup. Ct. Rep. 18.

The third step transferred from congress to the state government the power to preserve peace and good order, and regulate the making of private contracts, and the use and descent of private property, within this state.

The fact that the complainant cannot, under existing laws, acquire any permanent right to occupy any part of the lands in question does not militate against his present right. The work he proposes doing is lawful now, and interference therewith by the defendants is unwarranted, even though sanctioned by the president. The answer invokes a provision in an act of congress approved March 3, 1893, commonly spoken of as the "Wilson Act," (27 Stat. 633,) and in his argument counsel for the defendants contended that said provision prescribes the only mode in which right of way for a railroad or any interest in these patented lands can be lawfully acquired. The provision referred to authorizes the appointment of commissioners by the president to make selec-

tions of portions of said land for sale, and to make sales, and execute conveyances to purchasers. The point made is that the building of complainant's railroad may be an impediment to the selections and sales contemplated by said act, and therefore the act is to be so construed as to forbid the building of railroads and highways across said lands. To so construe the act, and give it force as a valid law, would make the erection of houses and other improvements upon these lands also unlawful, and deprive the patentees of vested rights. I consider this a sufficient reason for declining to give it such a construction. Another reason against it is that the law is by its own terms dependent for its practical operation upon the consent of the Indians. The commissioners to be appointed under it can effect nothing, unless they shall be empowered to act by the Indians. No such power has been given as yet, and it may never be given.

My conclusion is that the complainant is entitled to an injunction pendente lite, as prayed in his bill of complaint.