[No. 5818. Decided December 21, 1905.]

ANNIE GUYATT, *Respondent,* v. NUGENT KAUTZ *et al.,*
*Appellants.*[1]

INDIANS—LANDS—RULES OF DESCENT—PATENT. Lands allotted in severalty to an Indian as the head of a family by a patent subject to forfeiture if the lands were abandoned, and restricting the right of alienation for a certain period and until removed by legislative act, descends, upon the death of the allottee without children, as a qualified or base fee (which may become absolute upon removal of the restrictions) to his wife as the only remaining member of the family, under the community property laws of the state, where the customs and rules of descent of the tribe are not shown, such laws not being in conflict with the terms of the patent.

SAME—DESCENT AND DISTRIBUTION. By the Act of Congress of February 8, 1887, making the Puyallup Indians citizens of the United States, the laws of descent in force in the state of Washington became applicable to the Puyallup Indian lands allotted in severalty; and lands inherited by the wife of an original allottee descend upon her death to her daughter as her only heir, in preference to descendents of the sisters of the original allottee.

SAME—PATENT—TITLE. Under the Act of Congress removing the restrictions upon alienation of the lands of the Puyallup Indians, the qualified fee of the Indians ripened into an absolute fee simple title.

[1]Reported in 83 Pac. 9.

Appeal from a judgment of the superior court for Pierce county, Snell, J., entered May 9, 1905, in favor of the plaintiff, upon overruling a demurrer to the complaint, and the refusal of the defendants to plead over, in an action to quiet title. Affirmed.

*F. Campbell,* for appellants.

*George T. Reid,* for respondent.

CROW, J.—Respondent, Annie Guyatt, brought this action against Nugent Kautz and August Kautz, appellants, to quiet title to one hundred and sixty acres of Puyallup Indian land, in Pierce county. The allegations of the complaint are as follows:

"(1)   That on the 26th day of December, 1854, a treaty was concluded between the Puyallup and other bands of Indians on the one part, and the United States on the other part, and was thereafter duly ratified and confirmed by the president and senate of the United States. (2)   That, by the terms of said treaty, lands were reserved for the members of said bands of Indians, and it was agreed that the same were to be assigned and patented to said members in severalty; that the lands hereinafter described were a portion of the lands so reserved by said treaty. (3)   That on and prior to the 30th day of January, 1886, Napoleon Gordon was a Puyallup Indian and was one of the members of the Puyallup tribe of Indians, and was one of the members of said tribe entitled to an assignment of land on said reservation under the provisions of said treaty.   That on and prior to said 30th day of January, 1886, said Napoleon Gordon and one Sarah, a Puyallup Indian woman, were husband and wife, and they had, prior to said date, made a location on the land hereinafter described, as a permanent home. (4)   That on the 30th day of January, 1886, under the provisions of said treaty, the United States executed and delivered to the said Napoleon Gordon a patent for said land, which said patent is in the words and figures following, to wit:

" 'The United States of America, To all to whom these presents shall come, Greeting:   Whereas, by the sixth article of the treaty concluded on the twenty-sixth day of December,

*Anno Domini* one thousand eight hundred and fifty-four, between Isaac I. Stevens, governor and superintendent of Indian Affairs of Washington Territory, on the part of the United States, and the chiefs, headmen, and delegates of the Nisqually, Puyallup, Steilacoom, Squaksin, S'Homamish, Stechchass, T'Peeksin, Squiatil and Sa-heh-wamish tribes and bands of Indians, it is provided that the President, at his discretion, cause the whole or any portion of the lands hereby reserved, or of such other land as may be selected in lieu thereof, to be surveyed into lots, and assign the same to such individuals or families as are willing to avail themselves of the privilege, and will locate on the same as a permanent home, on the same terms and subject to the same regulations as are provided in the sixth article of the treaty with the Omahas, so far as the same may be applicable; And, Whereas, there has been deposited in the General Land Office of the United States an order bearing date January 20th, 1886, from the secretary of the interior, accompanied by a return, dated October 30th, 1884, from the office of Indian Affairs, with a list approved October 23rd, 1884, by the President of the United States, showing the names of members of the Puyallup band of Indians who have made selections of the land in accordance with the provisions of the said treaties in which lists the following tracts of land have been designated as the selection of Napoleon Gordon, the head of a family consisting of himself and Sarah, viz: [Here follows a description of the land.]

" 'Now, know ye, that the United States of America, in consideration of the premises and in accordance with the directions of the President of the United States under the aforesaid sixth article of the treaty of the sixteenth day of March, *Anno Domini,* one thousand eight hundred and fifty-four, with the Omaha Indians, has given and granted, and by these presents does give and grant, unto the said Napoleon Gordon, as the head of a family as aforesaid, and to his heirs, the tracts of land above described, but with the stipulation contained in the said sixth article of the treaty with the Omaha Indians, that the said tracts shall not be aliened or leased for a longer term than two years, and shall be exempt from levy, sale or forfeiture, which conditions shall continue in force until a state constitution embracing such lands within its boundaries shall have been framed and the legislature

of the state shall remove the restrictions, and no state legislature shall remove the restrictions without the consent of Congress. To have and to hold the said tracts of land, with the appurtenances, unto the said Napoleon Gordon, as the head of a family as aforesaid, and to his heirs forever, with the stipulation aforesaid. . . .'

"(5) That the Sarah named in said patent was the wife of said Napoleon Gordon, and the said Napoleon and the said Sarah were the only members of said family. (6) That in the month of October, 1886, said Napoleon Gordon died intestate in Pierce county, Washington, leaving him surviving his wife Sarah, but leaving no issue nor father nor mother, but leaving a sister, one Kitty Kautz. (7) That said Kitty Kautz was not a member of said Napoleon Gordon's family, and she received a patent for an assignment of land upon said reservation at the same time said Gordon received his patent. (8) That thereafter said Kitty Kautz died intestate, leaving as her sole heirs the defendants, Nugent Kautz and August Kautz, her sons. (9) That thereafter, and in the year 1897, the said Sarah died, intestate, leaving as her sole heir her daughter, Annie Guyatt, this plaintiff. (10) That after the death of said Napoleon Gordon the said Sarah remained in possession of the land in said patent described until her death, that upon the death of said Sarah this plaintiff took possession of said land and ever since has been and now is in possession thereof. (11) That heretofore the legislature of the state of Washington, by and with the consent of the Congress of the United States, removed the restrictions contained in said treaty against the alienation of said lands by the Indians, which said removal became operative on the 3rd day of March, 1903. (12) That by an act of Congress passed and approved on the 8th day of February, 1887, said Sarah Gordon, Kitty Kautz, Nugent Kautz, August Kautz and this plaintiff became citizens of the United States, and upon said date and by virtue of said act of Congress the tribal relations of the members of the Puyallup tribe of Indians ceased and terminated. (13) That by reason of the facts aforesaid the defendants and each of them claim a right and interest in and to said premises adverse to plaintiff, which claim operates as and is a cloud upon plaintiff's title to said premises."

A copy of the sixth article of the Omaha treaty appears in the opinion of this court in *Bird v. Winyer,* 24 Wash. 269, (64 Pac. 178), at page 274. Appellants interposed a general demurrer to said complaint, which being overruled, they declined to plead further. Judgment was thereupon entered, quieting respondent's title, and this appeal has been taken.

The only assignment of error is that the court erred in overruling said demurrer and entering judgment in favor of respondent declaring her the owner of the lands, and that appellants had no interest therein. Appellants contend that no title other than a mere right of possession passed to Napoleon Gordon under said patent, citing *Bird v. Winyer, supra,* and *Jackson v. Thompson,* 38 Wash. 282, 80 Pac. 454. Assuming that no right other than a mere possession was granted by said patent, and commenting on said restriction on alienation, appellants, in their opening brief, say:

"The facts in this case are squarely covered by both of those cases. The restrictions upon these lands were not removed and the fee did not vest until after March 3, 1903. Sarah Gordon died in 1897. Six years before that time, and while there was nothing but a possessory right in the land, her daughter Annie, the plaintiff herein, was not a member of the family, but was her child by a former marriage, hence no rights would pass by inheritance to such child.

"It would make no difference in this case whether the court laid down the rule that Sarah by virtue of the patent took an equal interest with Napoleon Gordon at the date of the patent or not. What she did take was simply a possessory right, and that is all she held at the time of her death in 1897. She could not inherit from Napoleon Gordon, because there was nothing to inherit but a possessory right, which ceased at her death in 1897.

"The patent runs to Napoleon Gordon and his heirs; therefore, when the fee under the patent attached in 1903 it vested in his heirs alone. His sole surviving heirs on March 3, 1903. and now, are the two defendants in this case, Nugent and August Kautz; they are his blood relatives, namely, the children of his deceased sister, Kitty Kautz. He left no

wife or children surviving him at the time his grant ripened
into a fee title, on March 3rd, 1903; neither did he leave a
father or mother. These two defendants, his now deceased
sister Kitty's children, are the sole blood relatives of Na-
poleon Gordon, and are the sole and only owners of this land.
Either this must be so, or the title could not vest in any-
body, and would go to the state or county by escheat. The
defendants must take this land by inheritance, or the de-
cisions hereinbefore referred to and rendered by this court
must be reversed."

We make this quotation to show appellants' theory, which
we think it unnecessary to analyze. It is true that certain
language used in *Bird v. Winyer, supra,* and quoted in *Jack-
son v. Thompson, supra,* would seem to support appellants'
contention that possession was the only right conveyed by the
patent. But we do not think the question as to whether the
right conveyed by the patent was possession only or amounted
to a fee was necessarily involved in either of those cases.
The final judgment in each instance was correct, whatever
the character of the title. All expressions used in *Bird v.
Winyer* on this subject were uttered *arguendo* in arriving at
the final judgment of this court. Yet, we there find use
made of the following expression as descriptive of the title
of Bird, under his patent: "There was simply a defeasible
title conveyed, and that is the condition of the estate at the
present time." At said time the restrictions on alienation
had not been removed. Bird afterwards instituted an action
in the United States circuit court against one Frank Terry,
to enjoin him from interfering with his possession and to
secure to himself the fruits of his former litigation. In
that action, although Hanford, J., speaking for the Federal
court, approved the decision of this court in *Bird v. Winyer,*
he in substance held Bird's patent did convey title. See,
*Bird v. Terry,* 129 Fed. 472.

Again, in *Ross v. Eells,* 56 Fed. 855, Hanford, J., in de-
fining the character of title conveyed by a similar patent
said:

"First, the patents issued by the President pursuant to the treaty made with the Indians passed the title in fee from the United States to the patentees, subject only to the restrictions and conditions subsequent, expressly declared in said treaty. No estate or reversionary interest in the patented lands is reserved or now held by the United States. The restrictions prevent alienation of the lands until authorized by a law of the state to which Congress must consent, otherwise than by leases for terms not exceeding two years. The conditions subsequent are that, for specified causes, any patent may be by the President canceled, and the land so forfeited may be assigned to other Indians, or sold for the benefit of all the Indians of the tribe in common. Instead of reserving the right to terminate the estate by a re-entry for breach of the condition, as is usual in conveying an estate subject to a condition, each of these patents creates a power in the president to reassign the land or sell it. This power is not inconsistent with the complete investure of title in the patentees."

Although *Ross v. Eells* was afterwards reversed in *Eells v. Ross,* 64 Fed. 417, yet in the latter case no exception was taken to said doctrine, which Hanford, J., again announced in *United States v. Kopp,* 110 Fed. 160. After a careful consideration of the terms of said patent, the sixth article of the Omaha treaty, the beneficial results sought to be attained thereby, and in the light of the authorities, we conclude that the patent set forth in the complaint conveyed to Napoleon Gordon a base, or qualified, fee simple title, subject to temporary restrictions as to alienation, which might thereafter become an absolute fee simple title. The qualifications subjoined to said base fee resulted from the stipulation of said sixth article of the Omaha treaty, that if said patentee or his family should neglect to till the soil or should rove from place to place, the president might cancel said assignment, even though patent had issued. This was a condition, however, that never happened in the case at bar.

"A qualified, base, or determinable fee (for I shall use the words promiscuously) is an interest which may continue forever, but the estate is liable to be determined without the

aid of a conveyance, by some act or event, circumscribing its continuance or extent. . . . It is the uncertainty of the event, and the possibility that the fee may last forever, that renders the estate a fee, . . ." 4 Kent's Commentaries, § 9.

See, also, 2 Blackstone's Commentaries, p. 109; 16 Cyc. 602; 11 Am. & Eng. Ency. Law (2d ed.), 368 · *United States v. Reese,* Fed. Cas. No. 16,137.

Some of the authorities speak of the right of alienation as incidental to a base or qualified fee. We do not think, however, that the title in fee conveyed to Gordon failed by reason of said temporary restrictions on his right of alienation. The United States imposed such restrictions for the protection and benefit of the owner, and that they do not prevent a fee simple title is decided in *Libby v. Clark,* 118 U. S. 250, 6 Sup. Ct. 1045, 30 L. Ed. 133. See, also, *Porter v. Parker* (Neb.), 94 N. W. 123.

Although, as intimated in *Bird v. Winyer, supra,* the only immediate practical benefit arising from the title conveyed was to secure to the patentee and his family possession and use of said land until such time as the restrictions on alienation should be removed by the legislature of the state of Washington and by act of Congress, yet the estate actually conveyed was one of inheritance, being a base fee simple title, temporarily restricted as to alienation, and subject to forfeiture in the event of the patentee or his family failing to till the soil or upon their returning to nomadic habits of life. If, then, the fee title, subject to such restrictions, was granted to Napoleon Gordon, to whom did such title descend at the date of his death, in October, 1886 ? Neither Napoleon nor Sarah was then a citizen of the United States. They were still members of the Puyallup tribe. In *Jones v. Meehan,* 175 U. S. 1, 20 Sup. Ct. 1, 44 L. Ed. 49, in a well-considered case, the following language is found, at page 29 :

"The Department of the Interior appears to have assumed that, upon the death of Moose Dung the elder, in 1872, the title in his land descended by law to his heirs general, and

not to his eldest son only.    But the elder Chief Moose Dung being a member of an Indian tribe, whose tribal organization was still recognized by the Government of the United States, the right of inheritance in his land, at the time of his death, was controlled by the laws, usages and customs of the tribe, and not by the law of the State of Minnesota, nor by any action of the Secretary of the Interior."

There is no allegation in the complaint pleading any usage or custom of the Puyallup tribe, nor can the courts take judicial notice thereof.    It seems to be conceded by appellants and respondent that, as regards real estate, the Puyallup tribe of Indians had no rule of descent.    The tribe, however, was still in existence when Napoleon Gordon died.    The title necessarily descended to some person.    In determining what became of it, we must look to the terms of the treaty in pursuance of which the patent was issued.    It provides that the President of the United States may prescribe such rules and regulations as will insure to the family, in case of the death of the head thereof, the possession and enjoyment of such permanent home and the improvements thereon.    It is evident from this provision, and from the entire body of the treaty, that the allotment was made for the benefit of the family.    It does not appear that the President ever prescribed any such rules or regulations.    In the case at bar, none were necessary, as Sarah was the only remaining member of the family, and would be entitled to succeed to any estate or title, held by Napoleon Gordon under his patent, and of which he died seized.    In the absence of adoption of any such rules or regulations, or of any showing as to the customs of the tribe, we are compelled to follow the laws of descent of this state, provided they do not conflict with any of the terms of said treaty or patent, which in this instance they do not.    In our opinion, the law of descent of community property would more properly apply, and under such laws of descent the land would go to Sarah.    This rule is applied by us by reason of necessity, and to carry out the evident purpose of the treaty in securing said estate to the

family, and not because we undertake at this time to decide either that the land was community property, or that while the tribal relations still existed the laws of descent of this state applied to these Indian lands.

A general act of Congress providing for allotments of Indian lands was passed and approved February 8, 1887, chapter 119, 24 Stat. 388. It is contended by respondent that, under the provisions of said act, the laws of descent in force in the state of Washington thereafter applied to these lands. We think this contention is well founded. By section 6 of said act Sarah Gordon, Annie Guyatt, Kitty Kautz, Nugent Kautz and August Kautz, all became citizens of the United States, and in pursuance of the doctrine announced in *Jones v. Meehan, supra,* the laws of descent of the state of Washington thereafter applied to these lands. Sarah Gordon died in the year 1897, after the enactment of said law. Respondent was her only heir and, under the laws of this state, inherited all the estate of her mother. On March 3, 1903, all restrictions on alienation under said patent were removed, in pursuance of acts of the legislature of the state of Washington and of Congress, thereby causing the title under said patent, theretofore a base fee, to ripen into an absolute fee, and such absolute fee simple title is now vested in the respondent, Annie Guyatt, free and clear of any claims of appellants.

The honorable superior court committed no error in overruling the demurrer. The judgment is affirmed.

MOUNT, C. J., DUNBAR, ROOT, RUDKIN, FULLERTON, and HADLEY, JJ., concur.