MEEKER et al. v. KAELIN et al.

(Circuit Court, W. D. Washington, W. D.   October 11, 1909.)

No. 1,396.

1. INDIANS (§ 18*)—INDIAN LANDS—ALLOTMENT—WIFE OF ALLOTTEE.

Where the wife of a Puyallup Indian allottee died prior to the approved of the allotment list by the Commissioner of Indian Affairs, the Secretary of the Interior, and the President, her heirs took nothing under the allotment list or patent subsequently issued to her surviving husband.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 18.*]

2. INDIANS (§ 18*)—INDIAN LANDS—ALLOTMENT—"PUBLIC LANDS"—PATENTS.

Lands in an Indian reservation are not "public lands," within Rev. St. § 2448 (U. S. Comp. St. 1901, p. 1512), providing that, where patents for public lands are issued pursuant to any law of the United States to a person who dies before the date of the patent, the title shall become vested in his heirs; nor are patents issued to Indian allottees of reservation lands issued pursuant to a law of the United States within such section.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 18.*

For other definitions, see Words and Phrases, vol. 6, pp. 5793–5795; vol. 8, p. 7772.]

3. INDIANS (§ 18*)—INDIAN LANDS—DESCENT—INDIAN CUSTOMS.

So long as Indian tribal relations were maintained prior to the Indians becoming citizens of the United States, the rules of descent of Indian property would be governed by the customs of the Indians, if such customs existed, subject, however, to treaty provisions.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 49; Dec. Dig. § 18.*]

4. INDIANS (§ 18*)—CUSTOMS—OCCUPATION OF PROPERTY—DEATH OF WIFE.

In accordance with Indian customs, the death of an Indian's wife caused no change in his right to occupy the ground which had theretofore been used by him and his family.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 18.*]

5. INDIANS (§ 13*)—INDIAN LANDS—PATENT.

Where a Puyallup Indian patent was issued to an Indian allottee who was the head of the family, the fee vested in him; the other members of the family taking no interest, though named in the patent.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 13.*]

6. INDIANS (§ 18*)—INDIAN LANDS—DESCENT—COMMUNITY PROPERTY.

The state law governing the descent of community property did not apply to the descent of Indian reservation lands patented to a Puyallup Indian allottee who was the head of a family.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 18.*]

7. INDIANS (§ 13*)—INDIAN LANDS—PATENTS—DEPARTMENTAL OPINION.

A ruling by the Interior Department and the Indian Bureau that Puyallup Indian patents granted the land to all the persons named therein, whether minors or adults, as tenants in common, was erroneous, and not binding on the courts.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 13.*]

8. INDIANS (§ 15*)—INDIAN LANDS—ALLOTMENT—TRANSFER.

Since Puyallup Indian allottees had no powers of alienation prior to March 3, 1903, when the restriction against alienation was removed, they could not, by estoppel, acquiescence, or otherwise, prior to that date, transfer a title which had vested in them either by patent or inheritance; nor

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

could a transfer of such land, prohibited by treaty and by the patent, be accomplished by departmental construction.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 15.*]

**9. LANDLORD AND TENANT (§ 62*)—DENIAL OF LANDLORD'S TITLE.**

Where defendants were in possession of property patented to an allottee, who held the fee under his patent, and while in possession such allottee conveyed the land to defendants, the fact that they had held the property under a lease from the allottee and others claiming an interest in the land did not estop them to deny the title of such other lessors, under the rule that where a tenant, in possession at the time he accepts a lease, is induced to accept it by mistake or misrepresentation of the lessor, or by mutual mistake of both parties, as to the law regarding the lessor's title, the tenant is not estopped, at least after the term has expired.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. § 153; Dec. Dig. § 62.*]

**10. INDIANS (§ 13*)—INDIAN LANDS—ALLOTMENTS.**

When the Supreme Court of the state and the United States Circuit Court of the district where an Indian reservation is situated have concurred for about eight years in a certain construction of the patents issued to the allottees in such reservation, and there are no decisions of such courts to the contrary, that construction will be regarded as a rule of property, and will be adhered to, although it does not agree with the construction adopted by the Interior Department.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 13.*]

At Law. Ejectment by John Meeker and others against Martin Kaelin and others. Judgment for defendants.

Chas. Bedford and Elmer E. Todd, U. S. Atty., for plaintiffs.
Boyle, Warburton & Brockway and S. F. McAnally, for defendants.

DONWORTH, District Judge. The plaintiffs in this action were originally members of the Puyallup band or tribe of Indians, and are now citizens of the state of Washington by virtue of Act of Cong. Feb. 8, 1887, c. 119, 24 Stat. 388. The defendants are also citizens and residents of the state of Washington. The action is brought in this court as one arising under the laws of the United States and treaties made under their authority. Plaintiffs sue for possession of an undivided one-half of a tract of land situated in Pierce county, state of Washington, and described as the S. W. ¼ of the S. W. ¼ of section 1, in township 20 N., range 3 E. of the Willamette meridian, containing 40 acres, except a certain railway right of way along the south line thereof. The land in dispute is part of what was formerly the Puyallup Indian reservation, created by executive orders pursuant to the treaty of December 26, 1854 (10 Stat. 1132; Abbott's Real Property Statutes, 1129), between the United States and the Nisqually and other bands of Indians. The treaty contains the following language:

"The President may, * * * at his discretion, cause the whole or any portion of the lands hereby reserved or of such other lands as may be selected in lieu thereof, to be surveyed into lots and assign the same to such individuals or families as are willing to avail themselves of the privilege, and will locate on the same as a permanent home, on the same terms and subject to the same regulations as are provided in the sixth article of the treaty with the Omahas, so far as the same may be applicable."

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The sixth article of the treaty with the Omahas of March 16, 1854 (10 Stat. 1044), is as follows:

"The President may, from time to time, at his discretion, cause the whole or such portion of the land hereby reserved, as he may think proper, or of such other land as may be selected in lieu thereof, as provided for in article first, to be surveyed into lots, and to assign to such Indian or Indians of said tribe as are willing to avail of the privilege, and who will locate on the same as a permanent home, if a single person over twenty-one years of age, one-eighth of a section; to each family of two, one-quarter section; to each family of three and not exceeding five, one-half section; and to each family of six and not exceeding ten, one section; and to each family over ten in number, one-quarter section for every additional five members. And he may prescribe such rules and regulations as will insure to the family, in case of the death of the head thereof, the possession and enjoyment of such permanent home and the improvements thereon. And the President may, at any time, in his discretion, after such person or family has made a location on the land assigned for a permanent home, issue a patent to such person or family for such assigned land, conditioned that the tract shall not be aliened or leased for a longer term than two years, and shall be exempt from levy, sale, or forfeiture, which conditions shall continue in force, until a state Constitution, embracing such lands within its boundaries, shall have been formed, and the Legislature of the state shall remove the restrictions. And if any such person or family shall at any time neglect or refuse to occupy and till a portion of the lands assigned and on which they have located, or shall rove from place to place, the President may, if the patent shall have been issued, cancel the assignment, and may also withhold from such person or family, their proportion of the annuities or other moneys due them, until they shall have returned to such permanent home, and resumed the pursuits of industry; and in default of their return the tract may be declared abandoned, and thereafter assigned to some other person or family of such tribe, or disposed of as is provided for the disposition of the excess of said land. And the residue of the land hereby reserved, or of that which may be selected in lieu thereof, after all of the Indian persons or families shall have had assigned to them permanent homes, may be sold for their benefit, under such laws, rules or regulations as may hereafter be prescribed by the Congress or President of the United States. No state Legislature shall remove the restrictions herein provided for, without the consent of Congress."

It is admitted that William Tocanum (sometimes called William Adams) was a member of the Puyallup tribe and died some time after the year 1903; that he was twice married; that his first wife was called Lucy and his second wife Sarah. The documentary evidence submitted shows that, in order to comply with the foregoing provisions of the treaty, a list containing a large number of proposed allotments was prepared by Edwin Eels, Indian agent in charge of the reservation, on February 1, 1884. In this list the tract of land in controversy and also another tract containing 120 acres are entered as allotted to William Tocanum, and opposite his name appear the words "head of family," while on the line immediately below there is written the name "Lucy" and opposite to it the word "wife." This list was approved by the Commissioner of Indian Affairs on October 20, 1884, by the Secretary of the Interior on October 21, 1884, and by the President on October 23, 1884. R. H. Milroy, a former reservation agent, had prepared in 1877 a proposed list of allotments, which was approved the same year by the Commissioner of Indian Affairs and the Secretary of the Interior; but no evidence is presented of its having been approved by the President or submitted to him. In the Milroy list the name of William Tocanum appears without naming any wife, and the 40-acre tract in controversy is listed to him.

On January 30, 1886, patents were executed by the President for the several allotments set forth in the list prepared by Agent Eels; all being in the same form, except as to names of allottees and descriptions of the lands. The patent covering the premises involved in this controversy is as follows:

"Whereas, by the sixth article of the treaty concluded on the twenty-sixth day of December, Anno Domini one thousand eight hundred and fifty-four, between Isaac I. Stevens, Governor and Superintendent of Indian Affairs of Washington Territory, on the part of the United States, and the chiefs, headmen, and delegates of the Nisqually, Puyallup, Steilacoom, Squawksin, S'Homanish, Ste-Chass, T'Peeksin, Squitaitl and Sa-heh-wamish tribes and bands of Indians, it is provided that the President 'at his discretion, cause the whole or any portion of the lands hereby reserved, or of such other lands as may be selected in lieu thereof, to be surveyed into lots and assign the same to such individuals or families, as are willing to avail themselves of the privilege, and will locate on the same as a permanent home on the same terms and subject to the same regulations as are provided in the sixth article of the treaty with the Omahas so far as the same may be applicable.'

"And whereas, there has been deposited in the General Land Office of the United States an order bearing date January 20, 1886, from the Secretary of the Interior, accompanied by a return dated October 30, 1884, from the office of Indian Affairs, with a list approved October 23, 1884, by the President of the United States, showing the names of members of the Puyallup band of Indians who have made selections of land in accordance with the provisions of the said treaties, in which list the following tracts of land have been designated as the selection of William Tocanum, the head of the family, consisting of himself and Lucy, viz.: The southwest quarter of the southwest quarter of section one, (40.00) acres, in township twenty north, and the east half of the southwest quarter and the southeast quarter of the northwest quarter of section fifteen, (120.00) acres, in township twenty-one north, of range three east of the Willamette meridian, Washington Territory, containing in the aggregate of one hundred and sixty acres.

"Now know ye, that the United States of America in consideration of the premises and in accordance with the directions of the President of the United States under the aforesaid sixth article of the treaty of the sixteenth day of March, Anno Domini one thousand eight hundred and fifty-four, with the Omaha Indians, has given and granted and by these presents does give and grant unto the said William Tocanum as the head of the family as aforesaid, and to his heirs, the tracts of land above described, but with the stipulation contained in the said sixth article of the treaty with the Omaha Indians that the said tracts shall not be aliened or leased for a longer term than two years, and shall be exempt from levy, sale or forfeiture, which conditions shall continue in force until a state Constitution embracing such lands within its boundaries shall have been formed and the Legislature of the State shall remove the restriction, and 'no state Legislature shall remove the restriction without the consent of Congress.' To have and to hold the said tracts of land, with the appurtenances, unto the said William Tocanum as the head of the family as aforesaid, and to his heirs, forever, with the stipulation aforesaid.

"In testimony whereof, I, Grover Cleveland, President of the United States, have caused these letters to be made patent and the seal of the General Land Office to be hereunto affixed.

"Given under my hand at the city of Washington, this thirtieth day of January, in the year of our Lord one thousand eight hundred and eighty-six, and of the independence of the United States the one hundred and tenth.

"By the President:

"Grover Cleveland,
"By M. McKean, Secretary.

"[Seal.]          S. W. Clark, Recorder of the General Land Office.

"Recorded Vol. 1, page 59."

The restrictions against alienation of these lands were terminated March 3, 1903, by virtue of the act of Congress of March 3, 1893 (27 Stat. 633, c. 209), and certain state legislation of an earlier date.

Lucy Tocanum, before her marriage with William, had been married to another Puyallup Indian, by whom she had one daughter, Elizabeth. She had no children by her second marriage. Elizabeth, about 1878 or 1879, was married to John Meeker, one of the plaintiffs. The other plaintiffs, Maggie Davis and Annie Squally, are married daughters of John and Elizabeth Meeker. There was a third child of the same marriage, Joseph, who died a minor and unmarried, after the death of his mother, Elizabeth, which occurred about 1895. Plaintiffs claim to be the owners of an undivided half interest in the 40-acre tract above described, as the heirs of Lucy Tocanum. Defendants claim to be the sole owners of the tract under a deed executed by William Tocanum to them, dated April 21, 1903, purporting to convey the entire premises.

The most important fact which the evidence leaves in dispute is the date of the death of Lucy Tocanum. Some of the evidence introduced by the plaintiffs tends to show that she died in the spring of 1886, some two months after the execution of the patent. A number of defendants' witnesses fixed the date of her death in the spring of 1883. The defendants have also introduced a written affidavit, made in August, 1901, by William Tocanum himself, John Meeker, one of the plaintiffs, and Joe Young, another Indian (who was also a witness upon this trial), stating that she died in the spring of 1883. In the making of this affidavit the present counsel for plaintiffs acted as notary public. This affidavit, made by the persons who must have had the best knowledge of the facts, before any litigation arose concerning the subject-matter, I consider very strong evidence. Mr. Eels, who was in charge of the reservation from 1882 to 1895, and who prepared the list of allotments before mentioned, was also a witness at the trial. He testifies that he moved to the reservation in August, 1883, and that Lucy died "not very long after I went on the reservation; a year or two, something like that." In answer to the question whether Lucy was living at the time he made the list in 1884, he says:

"She certainly was, to the best of my knowledge and belief. I would not send on any list with a dead person, if I knew of it."

Most of the witnesses state that she died in the spring or early summer. In view of all this testimony, and having regard particularly to the affidavit of William Tocanum and John Meeker, the allotment list, and the testimony of Mr. Eels, I find that Lucy died in the spring or early summer of 1884, and that she was dead at the time of the approval of the allotment list by the Commissioner of Indian Affairs, the Secretary of the Interior, and the President. She being dead, nothing passed to her or her heirs under the allotment list or the patent.

Section 2448, Rev. St. (U. S. Comp. St. 1901, p. 1512), providing that, where patents for public lands are issued in pursuance of any law of the United States to a person who dies before the date of the patent, the title shall become vested in the heirs of the deceased patentee, does not apply to this case. The lands in the Indian reservation

were not public lands, nor were these patents issued in pursuance of a law of the United States, within the meaning of that section. The evidence shows that Lucy's daughter, Elizabeth, was married to the plaintiff, John Meeker, several years prior to Lucy's' death. At the time of the execution of the allotment list and patents, John and Elizabeth Meeker did not live on the tract in controversy, but had taken another allotment, which was regularly included in the Eels list, and for which a patent issued along with the other patents. Neither they nor any of their children were ever members of William Tocanum's family. When the patents were issued the Puyallup Indians were not citizens of the United States. They did not become such until February 8, 1887. 24 Stat. 388, c. 119. Before that date, so long as tribal relations were maintained, the rules of descent would be governed by the custom of the Indians, if any such custom existed, subject, however, to the terms of the treaty. Jones v. Meehan, 175 U. S. 1, 20 Sup. Ct. 1, 44 L. Ed. 49. At the trial the parties introduced evidence touching the Indian custom with respect to descents. The evidence is far from satisfactory. It tends to show that in the case of personal property the brothers of a decedent took the whole estate to the exclusion of the children; that as to land the Indians had not evolved any such principle as private ownership of the soil transmissible to one's heirs, and that they recognized only possessory rights. I think, however, it is a fair inference that the death of an Indian's wife caused no change whatever in his right to occupy the ground which had theretofore been used by him and his family. In view of the other facts found, the provisions of the treaty, and the decisions hereinafter mentioned, I do not consider the Indian custom of practical importance in this case.

Even if it be assumed that the patent covering this land relates back and takes effect as of the date of the making of the allotment list by Agent Eels (which assumption I do not consider correct), nevertheless in my opinion it would follow that William Tocanum alone was the patentee, and that his sole deed, made April 21, 1903, conveyed the entire premises to the defendants. The Supreme Court of the state of Washington in March, 1901, decided the case of Bird v. Winyer, 24 Wash. 269, 64 Pac. 178, and there held that the entire interest granted by the United States in these Puyallup Indian patents vested in the head of the family therein named, and that the other members of the family acquired no .interest, though named in the patent. This ruling was followed by this court, speaking by Judge Hanford, in the case of Bird v. Terry (C. C.) 129 Fed. 472. The state Supreme Court reaffirmed this construction of the patents in Guyatt v. Kautz, 41 Wash. 115, 83 Pac. 9. It is true that in Bird v. Winyer it was held that only a possessory interest passed under the patents, and that no title to the fee was conveyed. This position was opposed to the construction adopted by this court in Bird v. Terry, and on reconsidering the question in Guyatt v. Kautz the state Supreme Court changed its view regarding the nature of the estate granted, and held that the "estate actually conveyed was one of inheritance, being a base fee-simple title, temporarily restricted as to alienation, and subject to forfeiture in the event of the patentee or his family failing to till the soil or upon their returning to nomadic habits of life." 41 Wash. 122, 83 Pac. 11. In

view of these decisions, which have been consistently adhered to by both the state and federal courts in the state and district where the lands are situated, I hold it to be a rule of property in this jurisdiction that the patents issued to the Puyallup Indians vested the entire estate conveyed in the head of the family named in the patent, and that the other members of the family named therein took no interest. I consider it unnecessary to state the reasons sustaining this construction of the patents. It is in accordance with decisions in other jurisdictions under similar grants. Summers v. Spybuck, 1 Kan. 394; Hicks v. Butrick, 3 Dill. 413, Fed. Cas. No. 6,458. See, also, Wilson v. Wall, 6 Wall. 83, 18 L. Ed. 727. A rule of property so established should be adhered to. Francis v. Francis, 203 U. S. 233, 27 Sup. Ct. 129, 51 L. Ed. 165.

In Guyatt v. Kautz the patent was issued to Napoleon Gordon as a head of a family consisting of himself and his wife, Sarah. Napoleon died some nine months after execution of the patent and before the passage of the act making these Indians citizens of the United States. That case and the present case, therefore, have in them the common element that the claim of one party is based on an alleged descent from an Indian who died before the conferring of citizenship upon the members of the tribe. They are distinguished by the fact that in that case it was the head of the family who died; in this case, the wife. The court there held that on the death of Napoleon the entire estate passed to his wife Sarah. In arriving at such conclusion the court made particular reference to the provisions of the treaty, which disclose an intention to secure the possession and enjoyment of the land and improvements to the family in case of the death of the head thereof, and also referred to the state law governing the descent of community property. I do not concur in the view that the community property law has any application to the question involved. That law is primarily a law defining the property rights of husband and wife during their joint lives, and only incidentally treats of descents. It provides that property acquired by either husband or wife, with certain exceptions, shall belong to both of them. In determining what persons became originally vested with interests in the land by virtue of these patents, granted by the national government to effectuate the terms of a treaty, recourse can be had only to the treaty, the patents, and the laws of the United States. McCune v. Essig, 199 U. S. 382, 26 Sup. Ct. 78, 50 L. Ed. 237. In actions properly brought before them the state courts undoubtedly had jurisdiction to decide all such questions; but the state Legislature could not make any person a grantee or affect in any way the original vesting of the title. While the tribal relations existed, and before Congress and the President had seen fit to make the laws of descent of the state of Washington apply, the most satisfactory basis for deciding questions of descent, in the absence of evidence of an Indian custom, was the treaty itself. The treaty provides that the President of the United States may prescribe such rules and regulations as will insure to the family, in case of the death of the head thereof, the possession and enjoyment of such permanent home and the improvements thereon. Even if it does not appear that any specific rules or regulations were ever prescribed by the President prior to the

act of 1887, it is the duty of the courts to give effect to the plain intention of the treaty, so long as its provisions remained the sole legislation on the subject. This was done, in effect, by the decision in Guyatt v. Kautz. On the death of the patentee in 1886, leaving a wife, but no children, the entire estate would pass to the only other member of the family, namely, the wife, because the treaty, construed according to its plain intent, so provided, and that without reference to the community property law of the state. For like reasons even if it could be held in this case that Lucy Tocanum, the wife, acquired a vested interest in these premises, I think it would violate the spirit of the treaty to hold that on the death of a member of the family other than the head (while the tribal relations continued) any part of the estate passed to persons not members of the family.

It follows, therefore, that the patent vested in William Tocanum the entire estate granted. In coming to this conclusion, I have not overlooked the argument that the Department of the Interior and the Indian Bureau have construed the patents as granting the lands to all the persons named therein, minors as well as adults, as tenants in common; that this construction was followed by the special commission which for a time was intrusted with certain duties with respect to these lands under an act of Congress; and that the construction given to a law or treaty by the executive department charged with its execution should be followed by the courts where the meaning is doubtful. Neither the Secretary of the Interior nor the special commission possessed any judicial power, and they never even attempted anything in the nature of a judicial investigation and determination of the question of title between the different claimants. Their rulings on questions of law could not operate to divest one person of his property and vest the title in another. As the Indians had no power of alienation before March 3, 1903, they could not, by estoppel, or acquiescence, or otherwise, transfer before that date a title which had vested by patent or by inheritance, and neither could a transfer of title prohibited by the treaty and the patent be accomplished by mere departmental construction. The cases of Bird v. Winyer and Bird v. Terry were decided before the restrictions on alienation were removed, and, in so far as there was a conflict between them and the previous official construction, they are controlling.

But it is urged that the defendants have recognized the plaintiffs as landlords and are estopped to deny their title. The evidence shows that in 1893 William Tocanum and his second wife, Sarah, leased the premises for one year to defendant Kaelin and another; the lease expiring April 1, 1894. This lease was renewed for two years in 1894, and again for two years in 1896, at which time the lease ran to both of the present defendants. The possession of the premises was acquired by the defendants under these leases. Later, during the year 1896, the defendants were served with a typewritten notice, prepared by the reservation authorities and signed by William Tocanum and the plaintiff John Meeker (for himself and the other plaintiffs), stating that the land was owned by Tocanum, one-half, and by the plaintiffs, heirs of Elizabeth Meeker, deceased, one-half, and that the signers had agreed that all rents due and to become due should be paid one-

half to Tocanum and one-half to John Meeker. The defendants complied with this notice and paid the rent accordingly. The subsequent leases to the defendants were executed by Tocanum and the plaintiffs jointly; the last lease expiring April 1, 1903. The defendants continued to hold possession of the land, and on April 21, 1903, consummated a purchase from Tocanum, whereby he made to them a deed of the entire premises. In my opinion the circumstances of this case bring it within the exceptions to the rule that estops a tenant from denying his landlord's title. William Tocanum was not estopped by his joining in the above-mentioned notice and leases, because he had no power of alienation at the time. After the expiration of the last lease on April 1, 1903, he was free to assert (as by his deed he did assert) his exclusive ownership of the premises, and to compel the defendants to attorn to him. The fact that whatever the Indians or their tenants did on the reservation up to March 3, 1903, the time that the right of alienation became effective, was practically subject to the control of the department, which held to a mistaken view of the ownership of the land, is not to be overlooked. Where the tenant did not take possession of the property under the lease, but was in possession at the time he took the lease, and he was induced to take the lease by mistake or misrepresentation on the part of the lessor, or acted under a mistake mutual to both parties, as to the law in regard to the title of the lessor, the tenant is not estopped, at least after the term has expired. Lakin v. Dolly (C. C.) 53 Fed. 333; Taylor, Landlord & Tenant, § 707; 2 Herman on Estoppel, § 866; Blankenship v. Blackwell, 124 Ala. 355, 27 South. 551, 82 Am. St. Rep. 175; Hammers v. Hanrick, 69 Tex. 412, 7 S. W. 345; Berridge v. Glassey (Pa.) 7 Atl. 749; Hammons v. McClure, 85 Tenn. 65, 2 S. W. 37. And see Camp v. Camp, 5 Conn. 291, 13 Am. Dec. 60, 61, with notes.

I conclude that the defendants are the sole owners of the land in controversy, and entitled to the possession thereof, and judgment will be entered in their favor.